No. 92,032

RYAN MONTOY, *et al.*, *Appellees/Cross-appellants*, v. STATE OF KANSAS, *et al.*, *Appellants/Cross-appellees*.

138 P.3d 755

Opinion filed July 28, 2006.

*Alok Ahuja*, of Lathrop & Gage L.C., of Overland Park, and *Stephen R. McAllister*, special assistant attorney general, argued the cause, and *Jeffrey R. King*, of Lathrop & Gage L.C., of Overland Park, *David W. Davies*, assistant attorney general, and *Phill Kline*, attorney general, were with Alok Ahuja on the briefs for appellant/cross-appellee State of Kansas.

*Dan Biles*, of Gates, Biles, Shields & Ryan, P.A., of Overland Park, argued the cause, and *Rodney J. Bieker*, of Kansas Department of Education, was with him on the briefs for appellants/cross-appellees Janet Waugh, Sue Gamble, John Bacon, Bill Wagnon, Connie Morris, Kathy Martin, Kenneth Willard, Carol Rupe, Iris Van Meter, Steve Abrams, and Bob Corkins.

*Alan L. Rupe*, of Kutak Rock LLP, of Wichita, argued the cause, and *Richard A. Olmstead*, of the same firm, and *John S. Robb*, of Somers Robb & Robb, of Newton, were with him on the brief for appellees/cross-appellants.

*Patricia E. Baker* and *David C. Cunningham*, of Kansas Association of School Boards, of Topeka, were on the brief for amicus curiae Kansas Association of School Boards.

*Lara M. Owens* and *Mark R. Thompson*, of Seigfreid, Bingham, Levy, Selzer & Gee, P.C., of Kansas City, Missouri, were on the brief for amicus curiae Kansas Families United for Public Education.

*David M. Schauner* and *Robert M. Blaufuss*, of Kansas National Education Association, of Topeka, were on the brief for amicus curiae Kansas National Education Association.

*Stephen R. McAllister* and *Todd N. Thompson*, of Thompson, Ramsdell & Qualseth, P.A., of Lawrence, were on the brief for amicus curiae Legislative Coordinating Council.

*Bernard T. Giefer*, of Giefer Law LLC, of WaKeeney, was on the brief for amici curiae Unified School District No. 208, Trego County, Kansas (WaKeeney), *et al.* (126 other Kansas school districts).

*Bradley R. Finkeldei* and *Peter C. Curran*, of Stevens & Brand, L.L.P., of Lawrence, were on the brief for amicus curiae Unified School District No. 229 (Blue Valley School District).

*Thomas R. Powell* and *Roger M. Theis*, of Hinkle Elkouri Law Firm L.L.C., of Wichita, were on the brief for *amicus curiae* Unified School District No. 259, Sedgwick County, Kansas.

*Anne M. Kindling*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, was on the brief for *amicus curiae* Unified School District No. 512, Shawnee Mission, Kansas.

*Per Curiam*: This is the fifth time this case has been before this court since the district court *sua sponte* dismissed the case on November 21, 2001. In that initial appeal by the plaintiffs, we reversed the district court and remanded the case for further proceedings in *Montoy v. State*, 275 Kan. 145, 62 P.3d 228 (2003) (*Montoy I*). On remand, the district court held that the Kansas School District Finance and Quality Performance Act (SDFQPA), K.S.A. 72-6405 *et seq.*, was unconstitutional. The defendants appealed, and on January 3, 2005, this court affirmed the district court in part, concluding that the legislature had failed to make suitable provision for the finance of the public schools as required by Article 6, § 6 of the Kansas Constitution. *Montoy v. State*, 278 Kan. 769, 120 P.3d 306 (2005) (*Montoy II*). We stayed the issuance of the mandate to allow the legislature a reasonable time to correct the constitutional infirmity in the school finance formula and set a deadline of April 12, 2005, for that to be accomplished.

Although we held that increased funding would be required, we did not dictate the manner in which the legislature should amend the financing formula to bring it into constitutional compliance, noting, as did the district court, that "there are 'literally hundreds of ways' the financing formula can be altered to comply with Art. 6, § 6." 278 Kan. at 775. However, we did make it clear that the actual costs of providing a constitutionally suitable education and the equity with which the funds are distributed are critical factors for the legislature to consider in crafting a suitable formula for financing public education. 278 Kan. at 775.

The legislature responded by enacting changes to the school finance formula on March 30, 2005. (2005 H.B. 2247 [L. 2005, ch. 152], modified by 2005 S.B. 43 [L. 2005, ch. 194] [collectively referred to as H.B. 2247].) See *Montoy v. State*, 279 Kan. 817, 819,

112 P.3d 923 (2005) (*Montoy III*). H.B. 2247 provided a funding increase of approximately $142 million for the 2005-06 school year.

The changes made by H.B. 2247 included modifications to the weighting components of the finance formula and changes to the authority of certain districts to raise revenue through local ad valorem property taxes. H.B. 2247 modified the funding formula by increasing the Base State Aid Per Pupil (BSAPP), bilingual, and at-risk weightings; phasing in increases in special education funding; eliminating the correlation weighting (while retaining the low enrollment weighting); and providing for annual adjustments to general state aid funding levels in accordance with the Consumer Price Index-Urban (CPI-U).

With respect to local revenue generating provisions, H.B. 2247 provided for incremental increases in the 25 percent cap on local option budgets (LOB) over the following 3 years to 30 percent in the 2007-08 school year; authorized districts with high housing costs to levy a "cost-of-living" ad valorem tax to pay enhanced teacher salaries; and authorized districts with extraordinary declining enrollment to apply to the Board of Tax Appeals (BOTA) for permission to levy an additional ad valorem tax.

H.B. 2247 also provided for a cost study to be performed by the Legislative Division of Post Audit to " 'determine the costs of delivering the kindergarten and grades one through 12 curriculum, related services and other programs mandated by state statute in accredited schools.' " 279 Kan. at 821.

After the new legislation became law, this court issued an order to show cause directing the parties to address whether the amendments to the financing formula met the legislature's constitutional obligation to " 'make suitable provision for financing' " of the public schools. 279 Kan. at 820. The parties were directed to address whether the actual costs of providing a suitable education were considered with respect to each component of the formula, as well as the formula as a whole, "and whether H.B. 2247 exacerbates and/or creates funding disparities among the districts." 279 Kan. at 820.

After an expedited briefing and argument schedule, on June 3, 2005, this court held that the changes made by H.B. 2247 failed

to bring the state's school financing formula into compliance with Article 6, § 6 of the Kansas Constitution. 279 Kan. at 840. This court considered each component of the formula, the new local ad valorem tax authorizations, and the overall funding provided by the changes as a whole and held that although H.B. 2247 provided a significant funding increase, it still failed to provide constitutionally suitable funding for public education because the changes were not based on considerations of the actual costs of providing a constitutionally adequate education and exacerbated existing funding inequities. 279 Kan. at 839-40.

Specifically, this court found that the increases in the BSAPP, at-risk weighting, bilingual weighting, and special education funding all varied substantially from the cost information in the record, and that the State had failed to provide any cost basis to support the amount of funding provided. 279 Kan. at 831-33, 839. Further, this court noted that the low enrollment weighting was not altered, and although we had specifically sought cost justifications for this significant funding component, none was provided. 279 Kan. at 836.

Moreover, this court found certain components of the amended formula exacerbated unjustified inequities in the distribution of funding. For example, we found that the funding disparity caused by the low enrollment weighting was exacerbated by the elimination of the correlation weighting for middle-sized and large districts. By rolling those funds into the BSAPP, low enrollment districts were given "even more of the funds that previously were devoted to balancing the disparities in per pupil funding caused by the low-enrollment weighting." 279 Kan. at 836.

We also found that "H.B. 2247's increased dependence on local property taxes, as decided by each school district, exacerbate[d] disparities based on district wealth." 279 Kan. at 839.

We held that the new cost-of-living property tax provision was not based on any evidence that there was any link between high housing costs and higher education costs or that the 17 districts that would benefit from the provision pay higher teacher salaries. We noted that the evidence at trial demonstrated the opposite— that the districts with high-poverty, high at-risk student populations

are the ones that need help attracting and retaining teachers. 279 Kan. at 835.

This court also held that H.B. 2247's two extraordinary declining enrollment provisions were potentially "extremely disequalizing because they are unlimited and have been designed to benefit a very small number of school districts." 279 Kan. at 838.

With respect to the increase in the LOB cap, this court found that the failure to provide for equalizing state aid for the new level of LOB authority worsened wealth-based disparities between districts, because districts with high assessed property values can generate maximum LOB revenues with far less tax effort than districts with lower assessed property values and median family incomes. 279 Kan. at 834.

Moreover, this court found it significant that H.B. 2247 did not attempt to correct the problem identified in *Montoy II*, namely, that unconstitutional underfunding has forced some districts to "use the LOB to fund the State's obligation to provide a constitutionally adequate education rather than enhancements," as the LOB was originally intended. 279 Kan. at 834.

This court also concluded that the Legislative Division of Post Audit (LPA) cost study provided for by H.B. 2247 was insufficient to determine the actual and necessary costs of providing a constitutionally suitable education because it would examine only the cost of "inputs"—the curriculum, programs, and related services required by law, and would not consider the costs of "outputs"—the cost of achieving measurable standards of proficiency. 279 Kan. at 842-43. Accordingly, the court required the cost study to incorporate the costs of outputs in addition to the statutorily mandated elements of a K-12 education. 279 Kan. at 843.

Because time was running out for school districts to prepare for the 2005-06 school year, there was no evidence of the actual costs of a suitable education other than the Augenblick & Myers (A&M) study, and the litigation had been pending since 1999, this court accepted the A&M study "as a valid basis to determine the cost of a constitutionally adequate public education" and ordered the legislature to implement for the 2005-06 school year a minimum funding increase of $285 million above the 2004-05 funding level, which

included the $142 million provided by H.B. 2247. 279 Kan. at 844-45. The $285 million increase represented one-third of the $853 million estimated cost of implementing A&M's recommendations.

Deferring to the cost study analysis to be performed by LPA, this court held that implementation of the remaining two-thirds of the A&M recommendation would be contingent upon the results of the LPA study. However, absent compliance, this court stated we would consider ordering an increase in funding of the remaining $568 million for the 2006-07 school year, in addition to other remedies. 279 Kan. at 846.

This court also ordered a stay on the increased LOB cap, the cost-of-living weighting, and both extraordinary declining enrollment provisions, due to their potential to exacerbate inequities in funding. 279 Kan. at 846. We retained jurisdiction, stating that further action, if necessary "will be taken by this court as is deemed advisable to ensure compliance with this opinion." 279 Kan. at 847.

The governor then called the legislature into special session. See Governor's Proclamation of June 9, 2005. By July 2, 2005, the legislature had failed to comply with this court's June 3, 2005, opinion, so we issued an order directing the parties to appear on July 8, 2005, and show cause "why this Court should not enter an ORDER enjoining the expenditure and distribution of any funds for the operation of Kansas schools pending the Legislature's compliance with this Court's June ruling regarding minimum funding increases for the 2005-06 school year." *Montoy*, Order of July 2, 2005.

Thereafter, on July 6, 2005, the legislature enacted S.B. 3 (L. 2005 Special Session, ch. 2), which provided a funding increase of $147 million over the $142 million provided by H.B. 2247.

With respect to the various components of the formula, S.B. 3 increased the BSAPP by another $35 to $4,257; increased the at-risk weighting from .145 to .193; increased funding for special education by raising the excess cost reimbursement from 88 percent in 2006-07 to 92 percent; lowered the enrollment cut-off for the low enrollment weighting from 1,725 students to 1,662; restored the correlation weighting with a threshold of 1,622 students; eliminated the cap on LOB equalizing supplemental state aid and increased access to LOB equalization for districts with lower prop-

erty valuations by raising the AVPP entitlement from the 75th percentile to the 81.2 percentile; replaced the extraordinary declining enrollment (EDE)-BOTA provision with a similar declining enrollment provision that applies more broadly to any district with a decline in enrollment from the previous year; and provided for matching state aid for districts with lower property valuations.

S.B. 3 also amended the cost study provision to require the LPA to conduct two cost studies: One would study the cost of inputs, and the other would estimate the cost of meeting student performance outcome standards adopted by the State Board of Education (Board). See K.S.A. 2005 Supp. 46-1131.

The parties appeared before this court on July 8, 2005. The issue before the court at the July 8 proceeding was whether the new legislation complied with this court's June 3, 2005, order for a minimum funding increase. At that hearing, all parties agreed that S.B. 3 complied with the court's June 3, 2005, order.

On July 8, 2005, this court held: "The legislature, by enacting S.B. 3, has complied with our June 3 opinion regarding the minimum funding increase" for the 2005-06 school year, and we approved the school finance formula, as amended by H.B. 2247 and S.B. 3, "for interim purposes." *Montoy*, Order of July 8, 2005. Further, because S.B. 3 increased LOB equalization and provided increased access to such equalization, this court lifted the stay on the provision increasing the LOB authority. Order of July 8, 2005. The stay on the EDE-BOTA provision was lifted as well, because S.B. 3 replaced it with a new provision designed to benefit a larger number of districts. The stays on the cost-of-living weighting and the EDE-Joint Committee on State Building Construction (JCSBC) provisions, however, were continued.

This court retained jurisdiction "to review further legislative action which may modify, repeal, or make permanent the temporary solution contained in S.B. 3." Order of July 8, 2005.

On January 9, 2006, LPA completed and submitted to the legislature the cost study report commissioned by H.B. 2247/S.B. 3. As pointed out by the State in its argument before this court, the legislature referred to this report throughout its 2006 session and sought further input and explanation from LPA during the session.

Thereafter, the legislature enacted changes to the school finance formula in S. B. 549 (L. 2006, ch. 197), which was signed by the governor on May 19, 2006.

The plaintiffs then filed a motion for a show cause order and briefing schedule, and on May 22, 2006, this court ordered the parties to brief and argue the issue whether S.B. 549 satisfies our court's prior orders.

Rather than modifying the provisions of S.B. 3/H.B. 2247, the legislature materially and fundamentally changed the way K-12 is funded in this state.

S.B. 549 adopted a 3-year funding scheme for K-12. It also alters the formula components by creating two additional at-risk weightings: the high-density at-risk weighting which provides additional at-risk funding for districts with high percentages of at-risk students; and the nonproficient at-risk weighting, which provides $10 million in additional funding in 2006-07 for students who are not proficient in reading or math, but are not classified as at-risk (eligible for the federal free lunch program).

An additional fundamental change occurred in providing flexibility to local districts to spend money received for at-risk, preschool at-risk, and bilingual education programs interchangeably. More significant are the changes that S.B. 549 made in the LOB.

The school finance formula provided a feature designed to equalize the ability of districts with lower property wealth to raise money through the use of the LOB. The formula was designed so that districts with an assessed valuation per pupil (AVPP) below the 75th percentile would receive supplemental aid in an amount designed to bring them up to par with the district at the 75th percentile of AVPP. Under this formula, districts with an AVPP above the 75th percentile would not receive supplemental state aid. K.S.A. 72-6434.

The legislature has increased equalization in two ways. First, it increased the LOB equalization threshold from the 75th percentile to the 81.2 percentile of AVPP. K.S.A. 2005 Supp. 72-6434(a). Accordingly, districts with an assessed valuation per pupil below the 81.2 percentile would receive supplemental aid on the LOBs

in an amount designed to bring those districts up to par with the districts at the 81.2 percentile of AVPP.

Second, the 25 percent LOB cap on supplemental general state aid was eliminated. See S.B. 3, sec. 12(b). In S.B. 549, the LOB authority was increased to 30 percent for the 2006-07 school year and 31 percent for 2007-08 and thereafter. An election would be required to adopt an LOB in excess of 31 percent. S.B. 549 did not change the AVPP threshold and did not impose a limit on equalization supplemental aid.

S.B. 549 further requires that such supplemental state aid be used to meet accreditation requirements, provide programs required by law, and improve student performance. S.B. 549, sec. 20(e)(1). The 3-year cumulative total of such aid under S.B. 549 is $74 million. Added to H.B. 2247/S.B. 3's increase of $47.7 million, the estimated increase since *Montoy II* is $121.7 million.

Under the prior structure, LOB state aid funding has never been considered part of the foundation level of funding provided by the State for a district's basic operating expenses. However, S.B. 549 now requires that supplemental state aid be applied to meet basic educational requirements, essentially making LOB state aid part of the foundation level of funding.

Further, the original intent and purpose of the LOB (which would necessarily include LOB state aid) was to allow individual districts to fund enhancements to a constitutionally adequate education provided and financed by the funding formula. *Montoy III*, 279 Kan. at 834 (citing *Montoy II*, 278 Kan. at 774). S.B. 549, however, now provides that school districts are required to use LOB state aid moneys to fund basic educational expenses.

The plaintiffs point out that these changes to the LOB state aid do not provide new money and are nothing more than a "money renaming scheme." Regardless of whether LOB state aid is new money, the point is that these changes to the equalizing state aid provisions of the LOB component of the formula fundamentally alter the structure of the funding system.

In addition, S.B. 549 increases the BSAPP from $4,257 to $4,316 in 2006-07; to $4,374 in 2007-08; and to $4,433 in 2008-09. That amounts to an increase of $101.25 million over the 3 years, and

$183.75 million since January 3, 2005. The low enrollment weighting adjustment was lowered to 1,637 pupils in 2006-07 and 1,622 pupils in 2007-08 and 2008-09. The high enrollment weighting (formerly the correlation weighting) threshold was lowered to correspond to the changes in the low enrollment weighting, resulting in $18.5 million over the 3-year period.

At-risk weighting was increased to 0.278 for 2006-07, 0.378 for 2007-08, and 0.456 for 2008-09, resulting in an estimated 3-year cumulative increase of $152.55 million. The 3-year total for high-density at-risk is $29.6 million. Bilingual weighting remained unchanged at .395 (based upon the number of student contact hours in a bilingual program). Special education excess costs reimbursement is set at 92 percent, totaling an estimated $80.3 million over 3 years, and $111.5 million since January 3, 2005. S.B. 549 provides an estimated total funding increase of $466.2 million. The total increase in funding since January 3, 2005, is an estimated $755.6 million.

S.B. 549 leaves intact the cost-of-living weighting, which is a new local property tax levy intended to allow districts with higher regional costs to raise additional revenue, purportedly to fund higher teacher salaries, although the requirement that funds be used for that purpose was removed from the statute. See 279 Kan. at 835. While we stayed the effect of this provision last year due to concerns about wealth-based disparities, nevertheless, this new component alters the funding formula.

We begin our analysis by addressing the State's first argument that (1) the school finance formula challenged by the plaintiffs no longer exists, and thus, the case is moot, and (2) this court cannot engage in the fact finding necessary to determine the constitutionality of S.B. 549. The first argument was raised in *Montoy III*, and we rejected it because this case was and continues to be in the remedial stages, or to be more precise, the compliance stage. It continues to have no merit, and we again reject it.

As to the State's second part of the argument, we agree that this court is an appellate court and not a fact-finding court. The constitutionality of S.B. 549 is not before this court. It is new legislation and, if challenged, its constitutionality must be litigated in a new

action filed in the district court. We have already made the determination that the school finance formula which was before this court in *Montoy II* was unconstitutional. The school finance system we review today is not the system we reviewed in *Montoy II* or *Montoy III*. The sole issue now before this court is whether the legislation passed in 2005 and S.B. 549 comply with the previous orders of this court. If they do then our inquiry ends and this case must be dismissed. A constitutional challenge of S.B. 549 must wait for another day.

The State argues alternatively that the legislature has been highly responsive to the court's orders in enacting the 2005 legislation and S.B. 549 and, therefore, the appeal should be dismissed. It points out that the 2005 legislation and S.B. 549 together provide annual increased funding by the 2008-09 school year of $755.6 million over that provided in 2004-05. The State further asserts the manner in which the funds are to be distributed is directly responsive to the concerns expressed by the court in its prior orders regarding at-risk students, special education students, and middle- and large-sized districts. The State also urges the court to lift the stay on the cost-of-living weighting.

Although noting it has some concerns with S.B. 549, the State Board of Education contends that S.B. 549, in conjunction with the changes made by the 2005 legislation, makes "suitable provision for finance" of the public schools as required by Article 6, § 6 of the Kansas Constitution, as construed by this court, and requests the court to release jurisdiction of the case.

The plaintiffs contend that S.B. 549 fails to comply with this court's prior orders and fails to make suitable provision for finance of the public schools as required by Article 6, § 6 of the Kansas Constitution. The plaintiffs contend the funding increases and formula components of S.B. 549 are not based on the actual and necessary costs of providing a suitable system of finance of public education and do not distribute funding equitably, exacerbating existing constitutional deficiencies.

Specifically, the plaintiffs contend that S.B. 549's funding for the 2006-07 school year is not based on actual and necessary costs because the funding it provides under the components of the for-

mula is significantly less than the funding increase LPA concluded to be the actual and necessary costs of meeting the mandated performance standards for 2006-07. As a remedy, the plaintiffs request that we order the legislature to implement the LPA Cost Study Analysis outcomes based recommendations for the 2006-07 school year.

The State contends that in determining whether S.B. 549 complies with this court's orders, it would be inappropriate for the court to rely on the LPA Cost Study Analysis as evidence of actual costs because it is not part of the record on appeal, and the validity of its conclusions have not been subjected to expert analysis and judicially determined through operation of the fact-finding process.

The plaintiffs contend the LPA Cost Study Analysis is part of the legislative history of S.B. 549 and, therefore, may properly be considered by the court. They argue that this court may accept the LPA Cost Study Analysis as substantial competent evidence of the actual and necessary costs of achieving the State Board's mandated proficiency standards because it was designed and funded by the legislature, performed by its employees, subject to its direction, and presented to the legislature.

First, we reject the State's contention that we may not consider the LPA Cost Study Analysis in determining whether the legislature complied with our orders. Although the LPA Cost Study Analysis is not evidence in the record on appeal, it is part of the legislative history of S.B. 549. *Cf., Urban Renewal Agency v. Decker,* 197 Kan. 157, 160, 415 P.2d 373 (1966) (historical background, legislative proceedings, and changes in a statute during course of enactment may be considered by the court in determining legislative intent).

The LPA Cost Study Analysis was commissioned by the legislature in order to assist in determining the actual costs of providing a suitable funding system. The legislature dictated the parameters of the study, the study was conducted by its employees, subject to the legislature's direction and oversight, the study was presented to the legislature early in the 2006 session, and there was an ongoing dialogue between the legislature and LPA concerning the study during the course of the legislative session. See Memoran-

dum of April 21, 2006 from LPA to all legislators. See also K.S.A. 2005 Supp. 46-1131 (commissioning LPA to conduct the Cost Study Analysis, setting the parameters of the study, and directing LPA to submit its report to the legislature by a date certain or request additional time); K.S.A. 46-1101 (legislative post audit committee comprised of five senators and five members of the house of representatives); K.S.A. 46-1102 (LPA headed by the post auditor, who is appointed by the legislative post audit committee); and K.S.A. 46-1103 (establishing LPA, and providing that its employees are under the direct supervision of the post auditor in accordance with the policies adopted by the legislative post audit committee).

Accordingly, we may consider the LPA cost study as part of the legislative history of S.B. 549 in determining legislative intent as it is relevant to the question whether the legislature has complied with our orders in this case. That does not mean, however, that we may consider the findings and conclusions in the report as substantial competent evidence of the actual and necessary costs of providing a suitable education.

The cost study has not been subjected to the fact-finding processes of litigation through which the parties were permitted to examine the validity and accuracy of the study, including the methodology and policy decisions supporting the study, the qualifications of the persons participating in the study, the assumptions underlying the study's conclusions, and the veracity of the underlying data. Although such inquiry is vital to determining the validity of the study's conclusions and the degree of weight to accord the study if offered at trial in the district court, this is an extraordinary appeal and the legislature had the opportunity to analyze the methodology and policy decisions of the LPA Cost Study Analysis, and thus to accept or reject its findings as a factor in determining what is suitable finance for the Kansas school system.

There is no question that the legislature has substantially responded to our concerns that the funding formula failed to provide adequate funding for students in middle-sized and large districts with a high proportion of minority and/or at-risk and special edu-

cation students and that the special education, bilingual, and at-risk student weighting factors were distorted by the lack of any actual cost basis.

S.B. 549 and the 2005 amendments together provide an estimated annual increased funding by the 2008-09 school year of $755.6 million over that provided in 2004-05. Of that total, $246 million—almost one-third—is directed to at-risk students: $206.5 million in new funding by 2008-09 has been provided through increases in the at-risk weighting from .10 to .456 by 2008-09; $29.6 million in additional at-risk funding is directed to districts with high percentages of at-risk students; and $10 million is provided to students who, though not classified as "at-risk" under the free lunch eligibility criteria, nevertheless are not proficient in math or reading, based on statewide proficiency assessments.

Bilingual funding has been increased from .2 to .395, adding $11 million in new funding as of 2005-06. Further, and significantly, the new legislation provides districts with the ability to use at-risk and bilingual funding interchangeably, giving districts with these students greater flexibility to use those funds to meet their needs.

Special education excess cost reimbursement has been increased from 85 percent at the time of *Montoy II* to 92 percent, and provides by 2008-09 an additional $111.5 million in new funding.

The legislature also responded to our concerns about the equitable distribution of funding. Equity does not require the legislature to provide equal funding for each student or school district. In *Montoy II*, we rejected the plaintiffs' claim that the school finance act violated the Equal Protection Clause of the United States and Kansas Constitutions. What is required is an equitable and fair distribution of the funding to provide an opportunity for every student to obtain a suitable education.

Our concerns about the low enrollment weighting were addressed by reducing its relative significance in the funding formula by increasing funding to middle-and large-sized districts with high percentages of special needs students. The legislature has substantially increased the at-risk weighting, including the new high-density weighting designed to provide additional funding to middle-and large-sized districts with high percentages of at-risk students.

S.B. 549 and the 2005 amendments together have provided non-low enrollment districts with an additional $47 million in new funding through the high enrollment weighting (formerly the correlation weighting), while reducing entitlement to the low enrollment weighting by lowering the cut-off from 1,725 pupils to 1,622 by 2007-08. In addition, we note that by restoring and increasing the high enrollment weighting, the legislature was directly responsive to our concern in *Montoy III* that the elimination of the correlation weighting exacerbated the disparities caused by the low enrollment weighting.

Further, the legislature responded to our concerns about wealth-based disparities inherent in the LOB by increasing the equalizing LOB state aid AVPP percentile.

Our prior orders have made it clear that we were concerned that the then existing financing formula was distorted and provided disparate funding because it was based on former spending levels with little or no consideration of the actual costs and present funding needs of Kansas public education.

The legislature has responded to this concern. The legislature has undertaken the responsibility to consider actual costs in providing a suitable system of school finance by commissioning the LPA to conduct an extensive cost study, creating the 2010 Commission to conduct extensive monitoring and oversight of the school finance system, and creating the School District Audit Team within LPA to conduct annual performance audits and monitor school district funding as directed by the 2010 Commission. In addition, the new legislation contains numerous provisions designed to improve reporting of costs, expenditures, and needs.

These new components provide the fundamental framework for a cost-based funding scheme in which the legislature will be regularly provided with the relevant, accurate information necessary to meet its constitutional obligation to provide and maintain a suitable system of financing of Kansas public schools.

We also find that the LPA Cost Study Analysis was considered by the legislature in making the decisions that underlie the formula changes in S.B. 549 and, thus, the legislature was responsive to our prior orders to consider actual costs. We note the plaintiffs' con-

tention that because S.B. 549 does not provide funding at the levels recommended by LPA's cost study, it was not based on actual costs and, therefore, fails to provide constitutionally suitable funding. However, implicit in that argument is the conclusion that the LPA Cost Study Analysis is credible evidence of the actual costs of education. As discussed above, we cannot reach that conclusion.

Nonetheless, as we stated in *Montoy II*: "It is clear increased funding will be required; however, increased funding may not in and of itself make the financing formula constitutionally suitable." 728 Kan. 775. Further, in *Montoy III* we said:

"As set forth earlier in this opinion, the Legislative Division of Post Audit has been commissioned to conduct a comprehensive and extensive cost study to be presented to the 2005-06 legislature. With such additional information available, the legislature should be provided with the cost information necessary to make policy choices establishing a suitable system of financing of Kansas public schools.

"We conclude, however, that additional funding must be made available for the 2005-06 school year to assist in meeting the school districts' immediate needs. We are mindful of the Board's argument that there are limits on the amount the system can absorb efficiently and effectively at this point in the budget process." 279 Kan. at 845.

The legislature is not bound to adopt, as suitable funding, the "actual costs" as determined by the A&M and LPA studies. On the other hand, the legislature cannot ignore the LPA study as it did the A&M study. In commissioning the cost study, the legislature clearly stated in H.B. 2247, Section 3:

" '(a) In order to assist the legislature in the gathering of information which is necessary for the legislature's consideration when meeting its constitutional duties to: (1) Provide for intellectual, educational, vocational and scientific improvement in public schools established and maintained by the state; and (2) make suitable provision for the finance of educational interests of the state, the division of post audit shall conduct a professional cost study analysis to determine the costs of delivering the kindergarten and grades one through 12 curriculum, related services and other programs mandated by state statute in accredited schools.' " 279 Kan. at 840-41.

We are mindful of the fact that the funding of public education is extraordinarily complex, just as we are mindful of the realities of the legislative process. We conclude that the legislature's efforts in 2005 and in 2006 S.B. 549 constitute substantial compliance with

our prior orders, through which it will have provided by 2008-09 at least 755.6 million additional dollars to the education of the State's most precious asset—our children.

The determination that the funding system failed to provide for suitable funding of the public schools as required by Article 6, § 6 of the Kansas Constitution was the culmination of an extensive 8-day bench trial of this case before the district court, with testimony generating over 1300 pages of transcripts, and over 300 exhibits consisting of thousands of pages, a large number of which were spreadsheets and other documents showing the financial operation and impact of the funding formula for school districts statewide. All of this evidence pertained to the issue at hand—whether the school funding formula as it existed at that particular time was constitutional. Our opinion affirming the district court's determination on that issue was made on the basis of that extensive record.

As previously noted, in response to our orders, the legislature has amended the school finance formula three times. The most recent changes made in S.B. 549 have now so fundamentally altered the school funding formula that the school finance formula that was at issue in this case no longer exists. It has been replaced with a fundamentally different funding scheme for which there are no facts and figures in the record from which we could determine how it will operate over the next 3 years.

We recognize that we could remand this case to the district court to allow the plaintiffs to amend their pleading to challenge the new funding formula. However, we decline to do so, electing instead to end this litigation. We do so for two reasons.

First, we note the point made by the Chief Justice of the Ohio Supreme Court in *DeRolph v. State*:

"A review of sixteen other state Supreme Court decisions that have declared their systems for funding public education unconstitutional reveals that a majority of those decisions remanded the case to a trial court. However, it is those states that have had the most difficulty producing a final plan that met the Supreme Court's opinion of constitutionality. For example, in New Jersey the issue has been through the courts for a period of twenty years and is now again pending in the New Jersey Supreme Court. Similar experiences, though not as dramatic, have occurred in Arizona, Arkansas, California, New Hampshire and Texas. In each of these states, either the final public school funding plan is not yet approved by the

Supreme Court of the state after several years of litigation after remand or the plan has been approved only after several years of litigation." *DeRolph v. State*, 78 Ohio St. 3d 419, 421-422, 678 N.E.2d 886, 888 (Ohio 1997) (Moyer, C.J., concurring in part and dissenting in part) (disagreeing with the majority's decision to remand the case to the district court pending legislative compliance so the trial court could hear evidence concerning the remedy after it is enacted and determine any new legislation's constitutionality).

See also *Abbott v. Burke*, 119 N.J. 287, 575 A.2d 359 (1990) (*Abbott II*) (Public School Education Act held unconstitutional); *Abbott v. Burke*, 136 N.J. 444, 643 A.2d 575 (1994) (*Abbott III*) (court ordered legislature to enact constitutional system and retained jurisdiction); *Abbott v. Burke*, 149 N.J. 145, 199-200, 693 A.2d 417 (1997) (*Abbott IV*) (thereafter, court ordered interim increased funding and remanded the case to district court for hearings on the special needs of urban students and to determine the costs of funding those needs); *Abbott by Abbott v. Burke*, 153 N.J. 480, 710 A.2d 450 (1998) (*Abbott V*) (on appeal from district court decision after extensive hearings, court ordered specific, detailed, comprehensive reform plan); *DeRolph v. State*, 78 Ohio St. 3d 193, 213, 677 N.E.2d 733 (1997) (*DeRolph I*) (remanded to district court pending legislative compliance); *DeRolph v. State*, 89 Ohio St. 3d 1, 36-38, 728 N.E.2d 993 (2000) (*DeRolph II*) (on appeal after extensive proceedings in trial court, court allowed the State more time to continue to refine system, set out areas of concern to address, and retained jurisdiction).

Second, S.B. 549 is a 3-year plan; thus, it may take some time before the full financial impact of this new legislation is known, a factor which would be important in any consideration of whether it provides constitutionally suitable funding. Indeed, as the Board's attorney pointed out at oral argument, we do not even know at this time how districts used the funding increase provided by the 2005 amendments.

The previous orders of this court affirming the judgment of the district court in part and reversing in part are reaffirmed in this opinion. We lift the stays imposed on the cost-of-living weighting and the extraordinary declining enrollment-Joint Committee on State Building Construction Provision. We dismiss this appeal and

remand to the district court with directions to dismiss the pending case.

NUSS, J., not participating.

ROSEN J., concurring: Every child in Kansas has a fundamental right to an education guaranteed by the Kansas Constitution. I, therefore, agree with the concurrences to *Montoy v. State*, 278 Kan. 769, 120 P.3d 306 (2005) (*Montoy II*), previously filed by Justices Beier, Davis, and Luckert. In addition to their thorough constitutional analysis, I note that every child is mandated to attend school. K.S.A. 2005 Supp. 72-1111. Our legislature has required all Kansans with control over or charge of a child to send that child to school. K.S.A. 2005 Supp. 72-1111. This requirement upon parents and guardians for the compulsory education of their children is paralleled by the requirement upon the legislature to provide that same constitutionally mandated education. Likewise, the citizens of Kansas through our state constitution have imposed a duty on the legislature to "make suitable provision for finance of the educational interests of the state." Kan. Const., Art. 6, § 6(b). It is our duty, as the arbiters and champions of the Kansas Constitution, to enforce each child's fundamental right to an education. Any analysis of the issues in this case must necessarily begin with an understanding of this right and the duties associated with that right.

Further, I concur with the majority's conclusion that S.B. 549 (L. 2006, ch. 187) complies with this court's prior orders and order to dismiss this case. I write separately to express my disagreement with the majority's analysis for concluding that S.B. 549 complies with this court's prior orders; to express my concern with including equalizing local option budget (LOB) state aid as part of the State's funding obligation; and to note my disagreement with the dissent remanding this case to the district court.

I disagree with the majority's analysis for concluding that S.B. 549 (L. 2006, ch. 197) complies with this court's prior orders. Although the majority opinion highlights the increase in funding for various categories of students, the analysis provides no linkage between those increases and the actual costs as determined by the Division of Legislative Post Audit (LPA) study or the Augenblick & Myers (A&M) study. I recognize that the legislature has appro-

priated substantially more money to the State's school system. However, this court did not simply order the legislature to appropriate substantially more money.

In *Montoy II*, this court required the legislature to consider the "(1) actual costs of providing a constitutionally adequate education and (2) funding equity" to fulfill its constitutional duty for making a "suitable provision for finance of the educational interests of the state." 278 Kan. at 775. The *Montoy III* court further ordered that the cost study commissioned by the legislature to be performed by the LPA incorporate consideration of the costs of outputs in addition to inputs. 279 Kan. at 843.

LPA completed a study in January 2006, estimating the costs for providing an education based on four different models, including three inputs-based models, distinguished by class size, and one outputs (or outcomes)-based model. Although the results of the LPA study may be considered as part of the legislative history for determining legislative intent, I agree with the majority's analysis that we cannot consider the study as evidence because it has not been subjected to the fact-finding process of litigation. Nevertheless, the completion of the LPA cost study substantially complies with our order in *Montoy III*.

According to the LPA study, the costs of educating Kansas children using an outcomes-based model requires an additional $399 million in state funding for the 2006-07 school year. The legislature thereafter enacted S.B. 549, which provides a 3-year plan for increasing school funding by approximately $466.2 million. In the first year of the plan, 2006-07, the legislature increased school funding by $194.5 million. In the second year of the plan, 2007-08, the increase is $149 million, and in the third year of the plan, 2008-09, the increase is another $122.7 million.

The plaintiffs argue that the legislature has fallen well short of the $399 million in additional funding necessary to meet the outcomes-based model costs for the 2006-07 school year. The State and the Kansas Board of Education (Board), on the other hand, argue that S.B. 549 substantially complies with this court's order to consider the actual costs of education because it was based on the results of LPA's cost study. To support their argument, the

State and the Board assert that the overall state funding provided for 2006-07 will exceed the $399 million increase recommended in the LPA study. However, their argument depends on the inclusion of equalizing LOB state aid as part of the State's funding obligation in accordance with section 20 of S.B. 549. Because LPA did not include equalizing LOB state aid as part of the State's funding for basic operating costs when it calculated the amount of increased funding needed for the outcomes-based education model, the State and the Board argue that the $399 million figure must be reduced by the amount of equalizing LOB state aid.

According to the State and the Board, in 2005-06, the State provided $222 million in equalizing LOB state aid. The State argues that after deducting the $222 million from LPA's recommended increase of $399 million, the total funding increase would be reduced to approximately $180 million. Because S.B. 549 provides $194.5 million in new funding for the 2006-07 school year, the State and the Board assert that the legislature has exceeded LPA's recommended funding increase.

Upon closer scrutiny of the State's figures, it appears the State's calculation fails to account for approximately $38 million. This is because LPA's $399 million figure does not include the approximately $38 million in additional equalizing LOB state aid that would be required if LPA's funding recommendation were adopted. The new funding provided by S.B. 549, however, does include that $38 million increase. Nevertheless, this discrepancy is not significant enough to alter my analysis. If LPA's $399 million figure is adjusted to include an additional $38 million in increased LOB state aid funding, and $222 million is deducted from that, LPA's recommendation, as adjusted, would be $215 million.

When that figure is compared with the $194.5 million funding increase provided by S.B. 549 for 2006-07, there is substantial compliance with LPA's recommended funding increase for the outcomes-based model. Accordingly, I conclude that the State has substantially complied with this court's order to consider the "actual costs of providing a constitutionally adequate education." *Montoy III*, 279 Kan. at 830.

In addition to requiring the State to consider the actual costs for providing a constitutional education, this court required the funding to be equitably distributed. *Montoy II*, 278 Kan. at 775. I find that the legislature has been responsive to our order to provide for equitable distribution of funding in two significant ways. Our equity concerns included disparate funding between the low enrollment districts and the middle- and large-sized districts with high percentages of special needs students. I agree with the majority that the significant increases in funding directed to the middle- and large-sized districts has reduced the relative significance of the low enrollment weighting in the formula. The legislature has also responded to our concerns about LOB inequities due to property value disparities by raising the assessed valuation per pupil (AVPP) from the 75th percentile to the 81.2 percentile for equalizing LOB state aid. K.S.A. 2005 Supp. 72-6434(a).

However, I have some concern with the new provisions of S.B. 549 that include equalizing LOB state aid as part of the State's funding toward meeting its constitutional requirement to suitably fund public education. My concern centers on the fact that in order to receive LOB state aid, districts have to impose a local property tax levy by enacting an LOB. Essentially, the State is arguing that allowing local districts to levy property taxes as a condition for receiving equalizing LOB state aid is synonymous with providing state funding. However, because the LOB is optional and some school boards or taxpayers may reject a local tax to support their school district, children in districts in which base level funding is inadequate and in which an LOB is not adopted, or is not adopted at the full cap, may not have the funds necessary for a constitutionally adequate education. In other words, if equalizing LOB state aid would be necessary to fund a district's basic educational costs, and a district or its voters choose not to adopt LOB funding in full or in part, the legislature has not met its constitutional duty to those children in that district. Counting equalizing LOB state aid as part of the State's foundation funding in essence shifts the legislature's constitutional responsibility to the local school districts. While the legislature may constitutionally allow local districts to choose to provide extras beyond the minimum constitutionally

adequate education, *Montoy III*, 279 Kan. at 839, it cannot allow districts to choose to fund less. By including equalizing LOB state aid to establish that S.B. 549 provides adequate funding, the legislature is essentially making the LOB funding mandatory in those districts where a constitutionally adequate education is not provided by base level state funding.

As of 2003, all but four of the Kansas school districts have opted into the LOB funding, and many were at the maximum cap as it then existed. Because there is such a high level of participation in the LOB funding, my concern about the equalizing LOB state aid does not alter my conclusion that S.B. 549 substantially complies with our order to consider actual costs and equitably distribute the State's education funding. However, so long as the legislature allows the LOB to remain an optional funding source rather than a mandatory one, my concern may be relevant in any subsequent challenge to the funding formula as amended by S.B. 549. In the school districts that receive less than the base level of state funding and which would have been eligible for equalizing LOB state aid but do not adopt an LOB at all, or adopt an LOB in an amount lower than the amount necessary to generate the funding shortfall, the State is arguably still responsible for providing constitutionally adequate funding. If other school districts begin opting out in part or in full of the LOB funding, the equitable distribution of state funding may be at risk. Such heavy dependence on a local contribution has historically caused disparity and equity concerns which have led to Kansas school finance litigation, including this case. We must never again allow a funding scheme that makes the quality of a child's education a function of his or her parent's or neighbors' wealth.

The inclusion of equalizing LOB state aid in S.B. 549 provides an essential financial log in keeping afloat the raft of adequate funding for the education of Kansas children. However, if local communities at some future time decide to remove that log, the delicate raft will have a difficult time remaining afloat, and, again, the constitutional right of all Kansas children to a suitably funded education could soon find itself imperiled.

I further note my disagreement with the dissenting position that this case should be remanded for factfinding. Although I agree that the LPA study cannot be considered as evidence, I reject the conclusion that we cannot evaluate the legislature's compliance with this court's prior orders without remanding the matter. Following the dissent's analysis, we could only evaluate the legislature's compliance with this court's prior orders if the legislature had followed the A&M study because it was the only cost study in evidence. If this court had intended to require adherence to the A&M study, it should not have deferred further consideration pending the completion of the new cost study, as it did in *Montoy III*.

In rejecting the dissenting position, it is important to note that I am not accepting the LPA study as a model for a constitutionally adequate education. The A&M study estimated the costs for an educational model based on certain inputs and outcomes. The LPA study, on the other hand, estimated the costs for completely different educational models, either based on inputs or outcomes, but not a combination of the two. Without evidence and expert opinions regarding the adequacy of each LPA educational model, this court cannot conclude that the LPA model would provide a constitutionally adequate education. If we were to require such evidence before making a decision, we would find ourselves trying to hit a moving target unless each new cost study estimated the costs for exactly the same educational model. However, the decisions in this case demonstrate that the model for a constitutionally adequate education has not been a stationary, definable concept.

In *Montoy I*, this court ruled that accreditation standards may not be an adequate model. 275 Kan. at 155. In *Montoy II*, the court reiterated that accreditation standards may not always be adequate and then relied on the legislature's own definition of "suitable education" in K.S.A. 46-1225(e) (statute authorizing A&M study) to conclude that the standard was not being met. 278 Kan. at 774-75. In *Montoy III*, this court adopted the educational model from the A&M study as a constitutionally adequate education. *Montoy III*, 279 Kan. at 844. However, the *Montoy III* court also interjected another educational model by requiring the legislature to estimate the costs for achieving the outputs as necessary

elements of a constitutionally adequate education. The *Montoy III* court also defined a constitutionally adequate education in accordance with K.S.A. 72-6439, the statute that requires the Kansas Board of Education to adopt an accreditation system based upon an improvement in performance.

As long as the target model for a constitutionally adequate education continues to move, the litigation in this case could continue in perpetuity. Each new cost study based on a new model would require factual testing at the district court before this court could determine whether the amended legislation is constitutional. Such a process would extend into an indefinite future, and the children of Kansas need a resolution of this matter now. Therefore, based on my analysis that the legislature has substantially complied with this court's prior orders, I concur with the result of the majority opinion dismissing this case.

BEIER, J., concurring in part and dissenting in part: I concur with much in the majority's opinion, including its implicit decision not to interfere with immediate implementation of 2006 S. B. 549 (L. 2006, ch. 197). Implementation must proceed, pending further order of this court. As we have previously observed, time is of the essence. Kansas school administrators, employees, and students need to plan for the coming school year and those that follow, with the assurance that the state funds promised by the legislature and governor by way of S.B. 549 will actually be forthcoming.

I respectfully dissent from the majority's decision to dismiss this action, leaving for another day in a future lawsuit the determination of whether S.B. 549 meets the standard of Article 6, § 6 of the Kansas Constitution. That issue is alive in this action. Constitutionality has always been and remains squarely presented. Further, our earlier opinions and orders in this case consistently and correctly equated compliance with this court's directives to adherence to the legislature's constitutional mandate. I am not willing to divorce these concepts now. If the State has demonstrated compliance with our directives, the legislature has corrected the constitutional deficiencies in the Kansas design for school finance. The converse would also be true: If the State has not demonstrated compliance with our directives, the legislature has not corrected the constitu-

tional deficiencies in the school finance design. Logically and legally, if we meant what we have said, one cannot be satisfied without the other.

Reduced to its essence, our June 3, 2005, Supplemental Opinion had two components. The first dealt with the need for increased funding in the 2005-06 school year. That component is moot. The second component dealt with constitutionality of Kansas' school finance design beyond the 2005-06 school year. With regard to that component, we said:

"[I]f (1) the post audit study is not completed or timely submitted for the legislature to consider and act upon it during the 2006 session, (2) the post audit study is judicially or legislatively determined not to be a valid cost study, or (3) legislation is not enacted which is based upon actual and necessary costs of providing a suitable system of finance and which equitably distributes the funding, we will consider, among other remedies, ordering that, at a minimum, the remaining two-thirds ($568 million) in increased funding based upon the [Augenblick and Myers] (A&M) study be implemented for the 2006-07 school year." *Montoy v. State,* 279 Kan. 817, 846, 112 P.3d 923 (2005).

The problem facing the parties and this court now is that, on the appellate record before us, we cannot know the status of (2) or (3) above. The soundness of the methodology and conclusions of the Legislative Division of Post Audit (LPA) cost study have not been tested by a typical adversary process. No evidence has been admitted on the ways in which the members of the legislature considered actual and necessary costs or equity. Without testimony and documentary evidence in the record to evaluate on these matters, this court simply cannot conclude the State has carried the burden placed upon it last year to demonstrate that the legislature's actions brought Kansas' school finance system into compliance with the state constitution. The appropriate way to respond is not to throw the plaintiffs out of court. It is to retain jurisdiction, acknowledge the factual deficiencies of the record, and remand to the district court for further proceedings focused on the constitutionality of the finance system, as altered by S.B. 549.

The district court proceedings could include any necessary substitution or realignment of parties, amendment of pleadings, appropriate discovery, and, finally, trial. Such a trial would, among

other things, test the methodology and conclusions of the LPA study and the soundness of legislators' consideration of it in their crafting of S.B. 549. It would also give us a record on the actual adequacy and equity effects of S.B. 549, including the redesignation of local option budget equalization aid, a redesignation never mentioned by any party in 2005 but upon which the State now wishes us to rely heavily to dismiss this case. Such a trial, and the careful study of the district court, also could illuminate whether a need for further remedial action persists, and, if so, what form it should take.

There is no question that the legislature has made substantial efforts to improve the adequacy and equity of our school finance system. The political realities of the legislative process make perfection unattainable, and no amount of money committed to public education will ever solve all of the problems of Kansas' urban poor or of its rural communities losing population. Still, because I am unwilling to graft a "good enough for government work" phrase onto Article 6, § 6 of our state constitution, I would permit this case to continue in the district court, where it may be finally resolved or prepared for further, much better informed review by myself and my colleagues.

LUCKERT, J., joins in the foregoing concurring and dissenting opinion.