IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,267

LUKE GANNON, BY HIS NEXT FRIENDS AND GUARDIANS, *et al.*,
*Appellees*,

v.

STATE OF KANSAS,
*Appellant.*

SYLLABUS BY THE COURT

1.

A party asserting compliance with a court decision ordering remedial action bears the burden of establishing such compliance.

2.

To determine compliance with the adequacy requirement in Article 6 of the Kansas Constitution, Kansas courts apply the test from *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989), which establishes minimum standards for providing adequate education. More specifically, the adequacy requirement is met when the public education financing system for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 2017 Supp. 72-3218.

3.

Under the facts of this case, the State has not met the adequacy requirement in Article 6 of the Kansas Constitution.

1

4.

By timely making financial adjustments in response to the problems identified with the State's chosen remediation plan and its accompanying calculations and then by completing that plan, the State can bring the K-12 public education financing system into compliance with the adequacy requirement in Article 6 of the Kansas Constitution.

5.

To determine compliance with the equity requirement in Article 6 of the Kansas Constitution, school districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort.

6.

The State has shown its proposed remedy, under the present circumstances, complies with Article 6's equity requirement by eliminating the different procedures for certain school districts to raise their maximum Local Option Budget (LOB) that this court held were inequitable in *Gannon v. State*, 306 Kan. 1170, 402 P.3d 513 (2017) (*Gannon V*). Because it eliminates the previous disparate treatment, maintaining the protest petition procedure for a school board's adoption of an LOB greater than "the statewide average for the preceding school year as determined by the state board" does not create an equity violation.

7.

The State has shown its proposed remedy, under the present circumstances, does not create an Article 6 equity violation by requiring all districts adopt an LOB that is at least 15% of the district's total foundation aid.

8.

The State has shown its proposed remedy, under the present circumstances, does not create an Article 6 equity violation by requiring districts transfer amounts from their LOB funds to their at-risk and bilingual education funds.

Appeal from Shawnee District Court; FRANKLIN R. THEIS, ROBERT J. FLEMING, and JACK L. BURR, judges. Opinion filed June 25, 2018. The State has failed to show the remedial legislation meets the adequacy requirement in Article 6 of the Kansas Constitution. The State can bring the K-12 public education financing system into compliance by timely making financial adjustments to the problems identified. The State has shown its proposed remedy meets the equity requirement of Article 6.

*Toby J. Crouse*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *M.J. Willoughby*, assistant attorney general, *Dwight R. Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant State of Kansas; *Arthur S. Chalmers*, of Hite, Fanning & Honeyman, LLP, of Wichita, was with him on the briefs for appellant State of Kansas.

*Alan L. Rupe*, of Lewis Brisbois Bisgaard & Smith LLP, of Wichita, argued the cause, and *Jessica L. Skladzien*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the briefs for appellees.

PER CURIAM: Article 6, § 6(b) of the Kansas Constitution imposes a duty on the legislature to "make suitable provision for finance of the educational interests of the state." On October 2, 2017, we ruled that the State had not met its burden of showing that its remedial legislation—2017 Senate Bill 19 (S.B. 19)—met Article 6's adequacy and equity requirements. *Gannon v. State*, 306 Kan. 1170, 1172, 402 P.3d 513 (2017) (*Gannon V*).

We stayed the issuance of our mandate until June 30, 2018. We reasoned this gave the State ample time to satisfactorily demonstrate that its additional remedial legislation brought the K-12 public education financing system into constitutional compliance. 306 Kan. at 1182 (State bears burden of establishing constitutional compliance). And the 2018 legislature responded to *Gannon V* in April by passing 2018 Substitute for Senate Bill 423 (S.B. 423) and 2018 House Substitute for Senate Bill 61 (S.B. 61).

But the State still has not met the adequacy requirement in Article 6 of the Kansas Constitution. Although it has expressed an intent to comply with the adequacy threshold discussed in *Montoy v. State*, 282 Kan. 9, 138 P.3d 755 (2006) (*Montoy IV*), it has failed to consistently implement its self-styled "*Montoy* safe harbor" plan of compliance described in the April 23, 2018, memo from the Kansas Legislative Research Department (KLRD) to legislative counsel. By timely making financial adjustments regarding problems identified below, however, the State can satisfactorily address the remaining constitutional infirmities in adequacy appearing in its chosen plan and particularly in the implementation. We discern two obvious problems arising from the April 23 memo:

1. The failure to adjust two years of funding for inflation through the approaching 2018-19 school year. Satisfactory adjustments would result in a higher amount of principal, i.e., more than the $522 million the memo calculates as yet owed to the school districts; and

2. The failure to adjust for inflation until the memo's calculated principal sum ($522 million, plus the adjustment referenced above) is paid in full, e.g., approximately five years. Satisfactory adjustments would result in more than that principal figure being paid during that span. But we acknowledge

4

the first year of payment—for school year 2018-19—need not be adjusted because that inflation has already been accounted for in paragraph 1 above.

We will also discuss other adequacy concerns, e.g., the State's treatment of virtual school state aid.

As to equity, upon review of this remedial legislation, we conclude that under the present circumstances the State has corrected the *Gannon V* constitutional infirmities and has created no others, contrary to plaintiffs' current contentions.

Because of the problems with adequacy we retain jurisdiction and stay the issuance of today's mandate until June 30, 2019, or until further order of the court. The Kansas School Equity and Enhancement Act (KSEEA)—enacted by S.B. 19—will remain in temporary effect. And S.B. 423 and S.B. 61 can go into temporary effect on the dates that legislation has scheduled—until further order of this court. This action acknowledges the State's position:  that the 2018 legislature's efforts and the amount of money added to the financing system for the approaching school year should permit such an extension through the 2019 regular legislative session. And it effectively grants the State's repeated request to so extend so it can develop a final remediation plan for our review.

FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit was filed in November 2010 after the State started making cuts to education funding. Those cuts began with a reduction to the $4,433 base aid amount for each student for school year (SY) 2008-09 (fiscal year 2009) which had been set by the 2006 Kansas legislature. In 2006, the *Montoy IV* court had relied upon that statutory

5

scheme, including planned increases to base aid, when it held the State had substantially complied with this court's orders and dismissed the case. 282 Kan. at 24-25.

In *Gannon v. State*, 298 Kan. 1107, 319 P.3d 1196 (2014) (*Gannon I*), we remanded the lawsuit to a three-judge panel for application of a refined test for adequacy. Later, in December 2014, the panel held the legislature unconstitutionally underfunded K-12 public education between fiscal years (FY) 2009 and 2012. The 2015 legislature quickly repealed its primary vehicle for school finance funding:  the School District Finance and Quality Performance Act (SDFQPA). The SDFQPA had been enacted in 1992 and established a base aid formula which provided a fixed amount of funding for each student and adjusted that funding by various weightings, e.g., for "at-risk" students.

The 2015 legislature replaced the SDFQPA with the Classroom Learning Assuring Student Success Act (CLASS). CLASS established "block grants" that froze funding levels for FY 2016 and FY 2017 at the FY 2015 level until CLASS expired on June 30, 2017. The panel held CLASS was also unconstitutional, and the State appealed.

On March 2, 2017, this court held CLASS was constitutionally inadequate in both structure and implementation. *Gannon v. State*, 305 Kan. 850, 390 P.3d 461 (2017) (*Gannon IV*). The State was given until June 30, 2017, to enact remedial legislation. 305 Kan. at 919. And the 2017 legislature ultimately passed S.B. 19.

S.B. 19 enacted the KSEEA, which returned to the same basic finance formula and revenue streams as the SDFQPA. *Gannon V*, 306 Kan. at 1179. At the time, S.B. 19 was predicted to add $292.5 million in "new money" over two years—FY 2018 and FY 2019.

6

306 Kan. at 1181. But as discussed below, it actually added approximately $24.5 million more for a total of $317 million.

On October 2, 2017, this court generally approved the KSEEA. *Gannon V*, 306 Kan. 1170. But we held the State failed to meet its burden to satisfactorily demonstrate S.B. 19 was reasonably calculated to address the inadequate funding. 306 Kan. at 1212. We also held S.B. 19 created four equity violations that we discuss in greater detail below. This court stayed the mandate, allowing S.B. 19 to take effect but only until June 30, 2018. 306 Kan. at 1239. So the KSEEA temporarily became law and is now codified at K.S.A. 2017 Supp. 72-5131 et seq.

In response to *Gannon V*, the 2018 legislature commissioned a cost study by WestEd. This organization used a cost function approach to estimate the costs associated with reaching certain performance outcomes (graduation rate and test proficiency) established in part by Kansas' Every Student Succeeds Act (ESSA) plan submitted by the State Department of Education to the United States Department of Education. The legislature also hired Jesse Levin of the American Institutes for Research to conduct a "peer review" of three of the State's cost studies. His first report reviewed two of them: the 2000-01 Augenblick and Myers study (A & M) dated May 2002 and the 2006 Legislative Division of Post Audit (LPA) cost study. His second report reviewed WestEd's study.

The legislature's WestEd cost study contained three funding scenarios for K-12 public education. These are: (1) compensatory support for Scenario A, which has a $6.438 billion cost estimate; (2) compensatory support for Scenario B, with a $6.719 billion cost estimate; and (3) no compensatory support, which has a $5.103 billion cost

7

estimate. Considering the $4.652 billion the State spent in SY 2016-17, Scenario A would require an increase of $1.786 billion, Scenario B an increase of $2.067 billion, and the no compensatory support category an increase of $451 million annually.

During a presentation to the legislature, WestEd explained that Scenarios A and B included "temporary transitional funding" used to "catch up" the districts that are not close to the performance goals costed out in the study. Once those achievement goals are obtained, the no compensatory support or "maintenance cost" represents the long-run cost required to sustain those higher performance levels.

In general, compensatory support for Scenario A was designed to achieve two goals by the end of SY 2021-22. These are: a 95% graduation rate in each school district and a proficiency target of 90% of students meeting levels 2, 3, or 4 in English language arts (ELA) and math on the assessments administered under the new Kansas Assessment Program. On the other hand, while compensatory support for Scenario B was also designed to achieve by the end of SY 2021-22 the same 95% graduation rate in each district, it called for a proficiency target of 60% of students to perform at only the highest levels—3 or 4—on the assessments.

In turn, plaintiffs commissioned a cost study by JL Myers Consulting and Picus Odden & Associates (Myers-Picus Report). It concluded that an additional $1.58 billion was needed to reach constitutional compliance for SY 2017-18. And plaintiffs hired Dr. Bruce Baker, their expert throughout this litigation, to conduct a "peer review" of the Kansas cost studies. Both plaintiffs' reports were submitted to the House Judiciary Committee through testimony by Schools for Fair Funding.

8

During the 2018 legislative session, S.B. 423 and S.B. 61 were passed. The governor signed both into law.

*The remedial legislation and its fiscal impact*

As mentioned, during SY 2016-17, the State spent $4.652 billion in federal, local, and state funding on K-12 education. The figures fluctuate, but around 66% came from state aid, 26% was local revenue, and 8% was federal money. These expenditures were spread over 286 school districts, serving more than 489,000 students. Kansas also employed more than 37,000 teachers, over 3,600 other licensed personnel, and had over 26,600 unclassified employees working in K-12.

The State focuses on how much "new money" it is adding to the school finance system since this court declared the funding inadequate on March 2, 2017, in *Gannon IV*, 305 Kan. at 854-55. Per the State's use of the term, "new money" refers only to the first time a new dollar enters the funding system. According to a May 1, 2018, KLRD memo to legislative counsel, through the combination of 2017 S.B. 19, 2018 S.B. 423, and 2018 S.B. 61, the legislature scheduled adding a total of approximately $854 million in new money to the "state aid" portion of school funding. The first part of this scheduled funding increase—now estimated to be $317 million—was enacted through S.B. 19 for the recently ended 2017-18 school year and for the upcoming 2018-19 school year. The remainder was partially added by S.B. 19 but was primarily to be attributed to S.B. 423 and S.B. 61, and it is "phased-in" during the next five years:  SY 2018-19 to SY 2022-23.

The State also cites each school district's increased local option budget (LOB) authority as a generator of new money. Under the LOB mechanism, a local school board can impose an additional mill levy on property in its district to augment the funds that are

9

distributed through the basic funding formula for state aid. See S.B. 61, § 5 (amending K.S.A. 2017 Supp. 72-5143). According to the State, this new authority is estimated to add up to $57 million over these six school years—and increased KPERS contributions are scheduled to add another $96 million over the same time period. The State argues that when these amounts are added to the state aid increases of $854 million, by SY 2022-23 a total of approximately $1 billion in new money—under the State's use of the term—will have been added since *Gannon IV*, 305 Kan. 850.

But it is unknown how much of the increased LOB authority will actually lead to additional funding across the state. This uncertainty exists because each of the 286 districts has the discretion to determine how much of its authority it will use—subject to a new 15% LOB mandatory minimum. S.B. 61, § 5.

Plaintiffs point out that this new funding's value is diminished because of inflation's impact during the five-year phase-in period. The State recognizes inflation is a concern. But at oral argument its counsel repeatedly asserted, without authority or clarification, that inflation is "constitutionally insignificant."

Most of the new money cited by the State is incorporated in the funding formula: the KSEEA. So it will become a continuing annual obligation—if the State fully funds the formula. This reality is evidenced by the fact that increases to the base aid amount are the single largest contributor to the new money. But some of the new money is a one-time investment. So a closer look at the amendments made in each bill is required.

*2017 S.B. 19*

Through its enactment of the KSEEA, S.B. 19 provides a base aid formula for calculating and distributing K-12 public education funds. It is modeled after the prior formula, the SDFQPA. But the KSEEA does contain some changes.

For the recently completed SY 2017-18, S.B. 19 set the base aid amount at $4,006. K.S.A. 2017 Supp. 72-5132(e). In the SDFQPA's last year (SY 2014-15) the statutory base was $3,852. In the two intervening years—SY 2015-16 and SY 2016-17—no base aid amount exists for comparison because the block grants essentially froze funding at the SY 2014-15 levels regardless of enrollment changes. See *Gannon IV*, 305 Kan. at 854. For the upcoming SY 2018-19, S.B. 19 increased the statutory base aid from $4,006 to $4,128. K.S.A. 2017 Supp. 72-5132(e).

S.B. 19 also made changes to the base aid formula weightings that create sustained funding increases, i.e., they are scheduled to continue from year to year. It increased the "at-risk student weighting" from .456 to .484, adding $21 million in SY 2017-18 alone. See K.S.A. 2017 Supp. 72-5151(a); see also *Gannon V*, 306 Kan. at 1195-96 (explaining the weighting system, e.g., multiplying the number of at-risk pupils included in a district's enrollment times the statutory ratio; the resulting product is then added to its full-time enrollment; the sum is in turn multiplied by S.B. 19's base aid, to produce the state financial aid to which it is entitled).

S.B. 19 also included a new method for calculating the high-density at-risk and bilingual weightings, which added $8.8 million in SY 2017-18. See K.S.A. 2017 Supp. 72-5151(b); K.S.A. 2017 Supp. 72-5150. It increased funding for kindergarten from half-

11

day to full-day, adding $60 million in SY 2017-18. See K.S.A. 2017 Supp. 72-5132(m), (ii). And it also eliminated the declining enrollment weighting, phasing it out by reducing state aid by $1.8 million in SY 2017-18 and SY 2018-19. See K.S.A. 2017 Supp. 72-5160.

S.B. 19 also increased early childhood funding for preschool at-risk students by $2 million for SY 2017-18 and SY 2018-19 and scheduled addition of the same amount through SY 2021-22. See K.S.A. 2017 Supp. 72-5154.

It added $1.7 million each for SY 2017-18 and SY 2018-19 to the professional development program under K.S.A. 2017 Supp. 72-2551. L. 2017, ch. 95, §§ 1(a), 2(a). For those same years, S.B. 19 added an $800,000 appropriation each year to the mentor teacher program under K.S.A. 2017 Supp. 72-2563. L. 2017, ch. 95, §§ 1(a), 2(a).

And S.B. 19 added $12 million for SY 2017-18 and SY 2018-19 for special education aid under K.S.A. 2017 Supp. 72-3422.

S.B. 19 also contained four provisions that this court later held were inequitable. *Gannon V*, 306 Kan. at 1213. They were: (1) adding a 10% at-risk floor, resulting in $2.5 million for two Kansas school districts; (2) allowing districts to pay utilities and property and casualty insurance from the capital outlay fund; (3) allowing districts to increase the LOB percentage up to the maximum based on protest petition and election procedures, while allowing districts already at the 33% to retain that authority; and (4) changing how the LOB state aid entitlement is calculated by using the prior year LOB instead of the current year LOB.

*2018 S.B. 423 and S.B. 61*

With S.B. 61, the 2018 legislature increased S.B. 19's base aid for upcoming SY 2018-19 from $4,128 to $4,165. As for later years, it also enacted the following annual base aid increases: $4,302 for SY 2019-20; $4,439 for SY 2020-21; $4,576 for SY 2021-22; and $4,713 for SY 2022-23. S.B. 61, § 4(e). Beginning in SY 2023-24, the base aid is to increase by the three-year rolling average of the consumer price index for all urban consumers (CPI-U) in the Midwest region as published by the bureau of labor statistics of the United States Department of Labor during the three immediately preceding school years. S.B. 61, § 4(e)(6).

S.B. 423, § 1(a) added another $32.4 million for special education aid for SY 2018-19, bringing the total increase for that year to $44.4 million ($32.4 million plus $12 million from S.B. 19). Then it scheduled $7.5 million to be added each year thereafter until 2022-23. According to plaintiffs, the $44.4 million brings total funding to only 83.2% of excess costs, i.e., less than the funding of 92% of excess costs mandated by statute. See K.S.A. 2017 Supp. 72-3422. "Excess costs" are defined as the amount over and above the average cost of educating a student who is not receiving special education services. *Gannon V*, 306 Kan. at 1185.

S.B. 423 appropriated an additional $500,000 for the mentor teacher program, bringing the SY 2018-19 total to $1.3 million ($500,000 plus $800,000 from S.B. 19). L. 2017, ch. 95, § 2(a); S.B. 423, § 1(a). But any future funding of this program will require additional appropriations.

For SY 2018-19, S.B. 423 appropriated $2.8 million for an ACT and WorkKeys assessments program. This program provides the ACT college entrance exam and the three ACT WorkKeys assessments required to earn a national career readiness certificate for each student enrolled in grades 9 through 12. And S.B. 423 appropriated $10 million for a Mental Health Intervention Team pilot program and a data system and school liaisons for the pilot program. S.B. 423, § 1(a). Any funding of this program beyond SY 2018-19 will require additional appropriations.

As referenced earlier, S.B. 61 mandated all districts have an LOB "that is at least 15% of such school district's total foundation aid." S.B. 61, § 1(a). And S.B. 61, § 1(b) provided that this court shall consider the mandatory 15% LOB funds when determining whether funding is adequate, and the court may consider the remaining LOB funds for that purpose. According to the record on appeal, all school districts have previously adopted an LOB greater than 15%—suggesting this requirement will not generate any "new" money.

Under S.B. 423, districts are also now required to transfer a portion of their LOB monies to their at-risk and bilingual funds. S.B. 423, § (4)(i)(2). Each district's obligation varies based on how much of its total foundation aid budget was generated by at-risk and bilingual weightings. A proportionate share of the general fund weightings will be applied to the LOB, and that proportional amount must be transferred into the corresponding at-risk and bilingual funds.

14

## ANALYSIS

## ADEQUACY ON THE MERITS

Issue 1:  *By timely making financial adjustments in response to the problems identified with the State's chosen remediation plan and its accompanying calculations and by completing that plan, the State can bring the K-12 public education financing system into compliance with the adequacy requirement in Article 6 of the Kansas Constitution.*

*Standard of review and burden of proof*

We set out our standard of review for constitutional adequacy and the State's burden of proof in *Gannon V*, 306 Kan. at 1181-83:

> "'Whether through structure and implementation the K-12 system is reasonably calculated to have all public education students meet or exceed the *Rose* [*v. Council for Better Educ., Inc*., 790 S.W.2d 186, 212 (Ky. 1989)] standards presents a mixed question of fact and law. When an appellate court reviews these mixed questions, it applies a bifurcated standard of review. Insofar as any of the panel's factual findings are in dispute, the court applies a substantial competent evidence standard. "Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014) (*Gannon I*).

> "'In determining whether substantial competent evidence supports the district court's findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it. *Gannon I*, 298 Kan. at 1175-76 (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1195-96, 221 P.3d 1130 [2009]). Accordingly, appellate courts do not reweigh the evidence or assess the credibility of witnesses. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

"'The panel's conclusions of law based on those findings are subject to our unlimited review. 298 Kan. at 1176, 1182. The ultimate determination of whether the legislature is in compliance with Article 6, § 6(b) of the Kansas Constitution is a question of law. See *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009) (constitutionality of statutes presents question of law over which Supreme Court exercises unlimited review).' *Gannon IV*, 305 Kan. at 880-81.

. . . .

"As for the burden of proof, it remains with the State, as we stated in *Gannon IV* regarding the State's future efforts to replace CLASS that was due to expire on June 30, 2017:

"'Once a new financing system is enacted, the State will have to satisfactorily demonstrate to this court by June 30, 2017, that its proposed remedy is reasonably calculated to address the constitutional violations identified, as well as comports with previously identified constitutional mandates such as equity. [Citation omitted.]

"'For those purposes, the State will bear the burden of establishing such compliance and explaining its rationales for the choices made to achieve it. See *Gannon II*, 303 Kan. at 709 (party asserting compliance with court decision ordering remedial action bears burden of establishing that compliance).' *Gannon IV*, 305 Kan. at 856.

. . . .

"As further explained below, in addition to our again taking judicial notice of appropriate facts, we previously held that the panel's findings of fact were supported by substantial competent evidence. *Gannon IV*, 305 Kan. at 881."

16

*Discussion*

We begin our analysis by again recognizing that the legislature has the power—and duty—to create a school funding system that complies with Article 6 of the Kansas Constitution. *Gannon I*, 298 Kan. at 1146-47 (language of Article 6 both empowers and obligates the legislature to make suitable provision for finance of the educational interests of the state). We explained that Article 6, § 6(b) contained minimum standards of adequacy which are met when the financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose*. 298 Kan. at 1170. The *Rose* court held:

> "[A] . . . system of education must have as its goal to provide each and every child with at least the seven following capacities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market." 790 S.W.2d at 212.

These are minimum standards codified by the Kansas legislature as educational goals since 2005, K.S.A. 2005 Supp. 72-1127, and presently codified in K.S.A. 2017 Supp. 72-3218. *Gannon IV*, 305 Kan. at 864; *Gannon I*, 298 Kan. at 1165-67, 1170. And in S.B.

19, the 2017 legislature openly and plainly declared its intention to meet them. "It is the purpose and intention of the legislature to provide a financing system for the education of kindergarten and grades one through 12 which provides students with the capacities set forth in K.S.A. 2016 Supp. 72-1127." L. 2017, ch. 95, § 70.

*The State's* "Montoy *safe harbor" identified*

The State argues its remediation plan constitutionally funds education by reaching what it describes as the "*Montoy* safe harbor." According to the State, this constitutional refuge of structure and its implementation was established by this court in 2006 with our decision in *Montoy IV*, 282 Kan. 9.

Plaintiffs instead point to studies performed over the years to determine necessary costs associated with educating Kansas K-12 students—to argue these studies and other recommendations show the State's proposed funding is an outlier. As noted in *Gannon V*, calculations in the record of "'new money needed'" for FY 2018 and FY 2019 were considerably higher than the $292.5 million initially presented by the State. At the high end was $1.7 billion as calculated by the plaintiffs by averaging the legislatively ordered cost studies performed by A & M in 2001-02 and the LPA in 2005-06 and then adjusting for inflation. And next highest was approximately $893 million as presented to the governor by the Kansas State Board of Education in its budget for FY 2018 (base aid of $4,604 for around $565 million) and FY 2019 (base aid of $5,090 for approximately $328 million). 306 Kan. at 1206. And the WestEd study's Scenario A would require an increase of $1.786 billion, Scenario B an increase of $2.067 billion, and the no compensatory support category an increase of $451 million annually.

Because the State's safe harbor plan is a substantial point of contention between the parties, a summarized history of *Montoy IV* is in order.

As discussed in *Montoy IV*, the State—through 2006 S.B. 549—had increased education funding by $466.2 million to be stretched over the upcoming three years. When combined with the previous legislative increases in 2005, the scheduled total would have been $755.6 million. This funding increase included raising the base aid from $4,257 to $4,316 for SY 2006-07; to $4,374 for SY 2007-08; and up to $4,433 for SY 2008-09. *Montoy IV*, 282 Kan. at 17-18. Given those scheduled statutory increases and other changes, this court held the new funding system constituted substantial compliance with our prior orders, but did not reach the issue of constitutionality. And we dismissed the *Montoy* litigation in July 2006. 282 Kan. at 18-19, 24-26.

Initially, funding proceeded as planned. The base increases for SY 2006-07 and SY 2007-08 were implemented. And, in 2008, the legislature enacted a $4,492 base aid amount for SY 2009-10—a $59 increase from the intended $4,433 base aid for SY 2008-09. L. 2008, ch. 172, § 6. But cuts began in 2009. *Gannon I*, 298 Kan. at 1114.

In February 2009—more than halfway through SY 2008-09—the legislature underfunded the statutory base aid, reducing it to an effective rate of $4,400 for that school year. And the $4,492 statutory base aid scheduled for SY 2009-10 was never implemented. Instead, due to more cuts, the base aid funding for that year was further reduced to $4,012. *Gannon V*, 306 Kan. at 1177.

In November 2010, the plaintiffs filed the current lawsuit alleging that 2006 S.B. 549—the legislation the *Montoy IV* court relied upon when holding the legislature had

19

substantially complied with the court's prior orders—was "an unconstitutional funding scheme that did not properly fund Kansas education." They also alleged that the funding cuts further reducing the total amount of state aid exacerbated the unconstitutional underfunding.

The funding cuts did not stop with the filing of the *Gannon* lawsuit. By SY 2011-12, the legislature had reduced base aid to $3,780. In total, the reduction to education funding through these base aid reductions alone constituted a loss of more than $511 million to school districts in FY 2009 to FY 2012. *Gannon I*, 298 Kan. at 1114-15.

In January 2013, the *Gannon* three-judge panel held the legislature had underfunded K-12 public education between FY 2009 and FY 2012. *Gannon I*, 298 Kan. at 1110. As an important component of the panel's remedy, its order adopted the $4,492 base aid amount (then called base state aid per pupil or BSAPP) enacted by the legislature in 2008 for SY 2009-10. The panel specifically held:

> "Fundamentally, we believe that the best point at which to begin to effect a cure to the constitutional deficiencies we have found in the reductions in the BSAPP is to go back to the 2008 session when a constitutionally compliant legislature amended K.S.A. 72-6410(b)(1) to adjust the BSAPP for FY2010 and forward to $4492 and adopt that sum as a funding requirement for FY2014. All other remedies adopted spring from this point and, as the case law referenced noted, are equitable and can flexibly accommodate any change in circumstance on good cause shown."

The State appealed. And this court remanded for the panel to reevaluate adequacy after applying this court's more clearly defined *Rose*-based test to the facts. *Gannon I*, 298 Kan. at 1171. The panel later issued several rulings which, combined with its January

20

2013 decision, declared that the school financing from FY 2009 through FY 2015 was constitutionally inadequate under the *Gannon I* test. *Gannon V*, 306 Kan. at 1178.

En route to that conclusion, the panel held:

"At the beginning of FY 2009 [SY 2008-09], the evidence established that the Kansas K-12 school system was functioning as a K-12 school system should in order to provide a *constitutionally adequate education* to Kansas children. . . . At that point the K-12 system was *constitutionally functioning* and moving . . . toward improving students' progress and opportunities as identified by the *Rose* factors. [And] [t]here were, in that period, resources available that gave school districts the fiscal capacity to provide a *constitutionally adequate K-12 school education* in light of the *Rose* factors to each student in Kansas willing to grasp it." (Emphases added.)

The panel continued in that vein, considering *Montoy* in its funding analysis:

"The unanimous evidence was that the Kansas K-12 system was progressing in its educational mission from and after the Opinion in *Montoy II* to the beginning of the cuts first had in February 2009, when the BSAPP beginning July 1, 2008, had been set at $4433 and was scheduled for FY2010 [SY 2009-10] to be $4492."

See also *Gannon IV*, 305 Kan. at 899-90 (substantial evidence supported panel finding that student achievement rose when funding increased after *Montoy IV* but eventually fell when funding began to decrease in 2009). And based upon its finding "that a correlation existed between funding and achievement, the panel determined the inadequacy was caused by underfunding." 305 Kan. at 913.

The State borrows from the panel's analysis to essentially contend:

1. because the panel ruled the State's K-12 education funding reached constitutional adequacy within several years after *Montoy IV;* and

2. because the panel's determination of adequacy was based upon the formula's funding increases after the decisions in *Montoy II*, *III*, and *IV*;

3. then the State's return to the basic formula of that time—and its resultant funding (plus accounting for inflation)—should again produce a constitutionally adequate level of funding.

The State claims it has raised education funding to at least such levels as to be firmly anchored in this self-described "*Montoy* safe harbor." And with some financial adjustments to the State's remediation plan, we basically agree that through structure—and particularly implementation—it can bring the K-12 system into compliance with the adequacy requirement in Article 6 of the Kansas Constitution. See *Gannon I*, 298 Kan. at 1199-1200 (stating adequacy test).

*The State's "*Montoy *safe harbor" analyzed*

In partial support of the *Montoy* safe harbor plan the State created, it provided this court and plaintiffs' counsel with a copy of an April 23, 2018, two-page memo from the KLRD to Legislative Counsel Curtis Tideman. It is a self-proclaimed attempt "to describe the considerations and calculations used to arrive at the $522.2 million" baseline for the State's plan. During oral argument, plaintiffs' counsel invited this court to judicially notice—or otherwise consider—this memo.

22

The remediation plan aimed to increase funding to reach this safe harbor by using the SY 2009-10 (FY 2010) school finance formula from the SDFQPA. According to the memo, the State began by determining how much state aid the old formula would generate with a $4,492 base aid amount—also from SY 2009-10—using current student enrollment and demographics to calculate eligibility for the weightings. Consistent with the State's rationale, the weightings "in the formula as it existed in school year 2009-2010" were used. As a result, the calculation admittedly does not include the changes adopted when the KSEEA was enacted in 2017, such as funding for all-day kindergarten. This particular calculation resulted in a total aid amount of $3,108,690,821 for 2010, i.e., SY 2009-10.

The State then adjusted that total aid amount for inflation after selecting the CPI-U for the Midwest region as reported by the U.S. Bureau of Labor Statistics. Ultimately, the State adjusted the SY 2009-10 amount with yearly inflation increases through SY 2016-17. As the memo's chart shows, this generated a total aid amount of $3,434,941,542.

| Year | Prior Year Amount | Inflation Percent | Inflation Adjustment Amount | New Amount |
|---|---|---|---|---|
| 2011 | $ 3,108,690,821 | 3.22 % | $ 100,099,844 | $ 3,208,790,665 |
| 2012 | 3,208,790,665 | 2.03 | 65,138,451 | 3,273,929,116 |
| 2013 | 3,273,929,116 | 1.40 | 45,835,008 | 3,319,764,124 |
| 2014 | 3,319,764,124 | 1.47 | 48,800,533 | 3,368,564,656 |
| 2015 | 3,368,564,656 | (0.54) | (18,190,249) | 3,350,374,407 |
| 2016 | 3,350,374,407 | 0.85 | 28,478,182 | 3,378,852,590 |
| 2017 | 3,378,852,590 | 1.66 | 56,088,953 | 3,434,941,542 |

Next, the State reduced that amount by the state aid that was "already scheduled." So the State subtracted $2,817,090,821 for SY 2017-18 state aid, which included $31.2

23

million of virtual school state aid and $2,785.9 million in state foundation (base) aid. The State also subtracted $95,606,000—the scheduled increase for SY 2018-2019 under S.B. 19. This in turn generated a "total target additional aid," i.e., extra funding needed, of $522,244,721.

Some questions exist, however, regarding the State's decision to reduce the total aid amount by $31.2 million for virtual school state aid. The Virtual School Act, K.S.A. 2017 Supp. 72-3711 et seq., provides state aid for students enrolled in virtual schools. K.S.A. 2017 Supp. 72-3715. But it operates outside the funding formula. It was enacted in 2008, so it existed separate from the SDFQPA in SY 2009-10—the year the State chose to begin its calculation. See L. 2008, ch. 147, § 2. It is unclear whether the State included virtual school state aid in the first step of its analysis when it generated the initial total aid amount of $3,108,690,821. If not, we cannot divine a rationale for the State later deducting it to calculate the total target additional aid of $522,244,721. For the State to fully implement the remediation plan it has chosen and presented to us, these questions remain for it to answer.

In addition to the KLRD Memo of April 23, the court has also examined the May 1, 2018, two-page memo from the KLRD to Tideman. During oral argument, counsel for both the State and the plaintiffs invited this court to consider it. After reviewing the analytical approaches and accompanying calculations in both memos, as well as the considerable amount of total funding added in SY 2017-18 through SY 2022-23 to be generated chiefly by base-aid-related calculations, we hold that the resultant funding is still short of reaching the State's *Montoy* safe harbor for that timeframe. More particularly, we question its "total target additional aid," i.e., the State's baseline.

24

Citing S.B. 423 and S.B. 61, the State proposes to spread payment of that principal amount—which it calculates to be $522 million—over five years. While plaintiffs believe the State's entire plan is woefully inadequate in its funding amount, they also point out other plan defects. For example, if the principal amount is not paid in lump sum today, financial allowance should be made for that phase-in period. As a result, plaintiffs argue that more than the State's proposed $522 million principal must be paid during that span. Plaintiffs make a valid point. And so adjustments need to be made to account for inflation during that time. But the first year of payment—for upcoming SY 2018-19—need not be adjusted for the reasons explained below.

Additionally, we disagree with the State's notion of a principal sum of only $522 million being owed today. Starting with the sum of $3,108,690,821, the April 23 memo calculates inflation for "2011" (SY 2010-11) through "2017" (SY 2016-17). But the memo does not appear to calculate inflation for SY 2017-18 and SY 2018-19—even though the apparent purpose of the memo was to calculate how much the legislative funding was short for SY 2018-19. Why else deduct the $95.6 million—"the estimated increase for school year 2018-2019 over 2017-2018 due to 2017 S.B. 19"? If the memo's apparent rationale is to be implemented consistently throughout, then inflation adjustments to the principal should be made for those two years.

Toward that end, we observe that the average of all the years of inflation shown in the State's chart from its April 23 memo (SY 2010-11 through SY 2016-17) is 1.44%. Inflation adjustments for SY 2017-18 and SY 2018-19 obviously enlarge the State's principal figure of $522 million. That enlarged principal amount then needs to be adjusted again (for inflation) until the new principal is paid in full over time—as the State's chosen remediation plan provides.

25

At first blush, one might argue that simply accounting for inflation only preserves the status quo. For as the panel stated, "Inflation adjustments . . . do nothing but maintain the status quo . . . . [They are] not a cure for any deficiencies existing in funding." Order of December 30, 2014, pp. 98, 100, 102; see also *Gannon V*, 306 Kan. at 1200 ("adjusting for inflation essentially only preserves the status quo on student performance"). But such an argument ignores the fact that the status being preserved is the legislatively devised finance system—and the future funding the legislature represented would flow from it— that led to the dismissal of *Montoy IV*. And preservation is complete with the addition of inflation. At the time of dismissal, and for a few years thereafter, increased funding led to increased student performance. The panel Order of December 2014 provided, "At the beginning of FY 2009 . . . the evidence established that the Kansas K-12 school system . . . was constitutionally functioning and moving . . . toward improving students' progress and opportunities as identified by the *Rose* factors." Accord *Gannon IV*, 305 Kan. at 899-900 (student achievement rose when funding increased after *Montoy IV* but eventually fell when funding began to decrease in 2009). These results helped lead the panel to conclude, "[M]oney makes a difference in public education." 306 Kan. at 1203.

Moreover, the State has taken steps to address certain subgroups of students specifically identified since *Montoy IV* as underperforming, e.g., at-risk. For example, in *Gannon IV* we observed that from SY 2011-12 to SY 2015-16, for all students receiving free and reduced lunches the percentage who did not meet the State's minimum reading standards was initially 20.2% and then 34.8%; for mathematics, it was initially 21.8% and then 37.5%. 305 Kan. at 906-07. The predominant factor for qualifying for at-risk services in SY 2018-19 under the Kansas At-Risk Pupil Assistance Program requires the student to not be working at grade level in either reading or mathematics. But some of the

26

other qualifying criteria are that the student must: (1) be identified as an English Language Learner; (2) be homeless and/or migrant; (3) have social emotional needs that cause the student to be unsuccessful; or (4) not meet the requirements for graduation or promotion to the next grade. So any change to the formula that increases at-risk funding would target these qualifying students. And the KSEEA did change the formula in several ways that directly increase funding for at-risk services—as long as the formula is fully funded.

The KSEEA increased the at-risk weighting, which added $21 million in SY 2017-18 alone. It also added new methods for calculating the high-density at-risk and bilingual weightings, which added $8.8 million in SY 2017-18. These weighting-calculated funds will continue every year. And districts are now required to transfer amounts from their LOB funds to their at-risk and bilingual education funds. S.B. 423, § 4(i). This provision, coupled with other authorizations, has the potential to increase spending on these services.

The State also began funding all-day kindergarten, "a widely accepted approach to improve student achievement." *Gannon V*, 306 Kan. at 1208. All-day kindergarten added $60 million in SY 2017-18, which is continued each year thereafter. This funding for all-day kindergarten "frees up funds some school districts were already spending on it and allows them to be applied elsewhere." 306 Kan. at 1208. Additionally, for preschool at-risk students another $10 million was added—$2 million a year in SYs 2017-18, 2018-19, 2019-20, 2020-21, and 2021-22.

For SY 2018-19, S.B. 423 also appropriated $2.8 million for an ACT and WorkKeys assessments program. This program provides the ACT college entrance exam

and the three ACT WorkKeys assessments required to earn a national career readiness certificate for each student enrolled in grades 9 through 12. According to the legislature, the purpose of this program is to ensure that "no student enrolled in grades nine through 12 of any school district shall be required to pay any fees or costs to take such exam and assessments." S.B. 423, § 1. This funding appears to be meant to benefit all students. See, e.g., *Rose* capacity (vii): achieve "sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market." 790 S.W.2d at 212.

While the State does not so argue, the funding could be particularly beneficial for students, e.g., at-risk, who would have been discouraged or prevented from taking these assessments based on the expense.

We acknowledge we did not find some of these changes persuasive on the issue of adequacy in *Gannon V*, 306 Kan. at 1208-09. But with the large increases to the base aid amount created since that time by S.B. 423 and S.B. 61, coupled with 2017 S.B. 19's increased weighting multiplier (from .456 to .484), even more money is generated for students qualifying for at-risk services.

*Conclusion regarding adequacy*

The State has presented us with its self-described *Montoy* safe harbor plan that purports to bring the K-12 public education financing system into compliance with the adequacy requirement in Article 6 of the Kansas Constitution. In its current status, the State's chosen remediation plan does not comply. But by timely making financial adjustments in response to the plan's identified problems and its accompanying

28

calculations—and then by completing the plan—the State can bring the system into constitutional compliance.

As a result, we need not address whether the WestEd cost study and Myers-Picus Report can be considered for the first time on appeal. See *Montoy IV*, 282 Kan. at 21 (The 2006 LPA study can be considered "in determining legislative intent as it is relevant to the question whether the legislature has complied with our orders in this case."). For the same reasons, we also need not address at this time the other cost estimates in the record or otherwise consider the plaintiffs' argument that the State's plan is a financial outlier.

## EQUITY ON THE MERITS

Issue 2: *The State has shown that its remedy, under the present circumstances, meets its burden of establishing that the K-12 public education financing system provided by the legislature through S.B. 19, S.B. 423, and S.B. 61 satisfies Article 6's equity requirement.*

*Standard of review*

We set out our standard of review for constitutional equity in *Gannon V*. The State had the burden to show "[s]chool districts . . . have reasonably equal access to substantially similar educational opportunity through similar tax effort." *Gannon I*, 298 Kan. at 1175. That burden extended to showing S.B. 19 satisfied the equity requirement of Article 6 in both structure and implementation. *Gannon V*, 306 Kan. at 1214. We have repeatedly warned about the lurking dangers when adjusting for equity because a consequence may be that adequacy is affected. See, e.g., *Gannon v. State*, 303 Kan. 682, 743, 368 P.3d 1024 (2016) (*Gannon II*) (funding system legislature enacts "must be demonstrated to be capable of meeting the equity requirements of Article 6—while not running afoul of the adequacy requirement") (citing *Gannon I*, 298 Kan. at 1199). And

29

because of the connection between these Article 6 components, the reverse is also true: Any proposed adequacy remedy must also comport "with previously identified constitutional mandates such as equity." *Gannon IV*, 305 Kan. at 856.

*Discussion*

In *Gannon V*, we identified four areas where the State's burden was not met: expansion of the authorized uses for the capital outlay fund; calculation of supplemental general state aid using a district's LOB percentage from the preceding school year, rather than the current year; allowing districts to receive at-risk funding based on a 10% at-risk student population, even if that represented more at-risk students than were actually in that district; and establishment of procedures for districts to raise their maximum LOB that were not applied to all districts uniformly.

With the enactment of S.B. 423 and S.B. 61, plaintiffs acknowledge that the State has remedied the first three of those four identified equity issues. They contend, however, that S.B. 423 still violates the constitutional equity requirement in three ways: (1) it has a provision requiring that any proposal that would increase a district's LOB percentage above 30% would be subject to a protest petition process requiring approval in an election; (2) it requires that all districts adopt a 15% LOB; and (3) based on a proportional formula, it requires districts to transfer funds from their LOB to their district's at-risk and bilingual funds.

*Protest provision*

In S.B. 61, the legislature authorized districts to adopt an LOB at a level greater than the statewide average for the preceding school year. But it made that authority subject to a protest petition and election provision. Plaintiffs argue subjecting adoption of an LOB at the higher level to the protest petition procedure "unconstitutionally conditions a school district's ability to fund an education for its students on the whims of local voters," creating inequalities in access to funding, to the advantage of wealthier districts. Plaintiffs assert further that this court has found any protest petition procedure attached to adoption of an LOB in excess of 30% is an equity violation.

First, a clarification. Although plaintiffs refer to an S.B. 61 requirement for a protest petition procedure for adoption of an LOB greater than 30%, that is not accurate. S.B. 61, § 5(c) requires the protest petition procedure for adoption of an LOB greater than "the statewide average for the preceding school year as determined by the state board." Next, substantively, plaintiffs misread our holding on this question in *Gannon V*. The equity violation that we identified was not based on an inherent unacceptability of a protest petition and election procedure when a district desires to adopt an LOB greater than a statutory amount. Instead, we held:

> "The legislature, in effect, allowed certain districts to increase their LOB authorization above 30% without having to be concerned about the uncertainties of an election process and has now grandfathered those higher LOB authorizations, including any related equalization aid. The other districts wishing to do so—potentially more than 200 of them—must now clear the structural hurdle imposed by the protest-petition process reinstated by S.B. 19, § 15." *Gannon V*, 306 Kan. at 1229.

31

In other words, the Article 6 equity violation lay in the disparate treatment among districts, not in the mere presence of the protest petition procedure. The legislature's adoption of S.B. 423 has provided a remedy for that violation by removing the provisions that created that inequity. S.B. 423, § 4(f).

*Mandatory 15% LOB*

As the first of the new equity violations they raise, plaintiffs claim the remedial legislation violates the equity component of Article 6 by requiring that all districts adopt an LOB that is at least 15% of the district's total foundation aid. S.B. 61, §§ 1(a), 5(a). Plaintiffs point to cautionary statements from this court about increasing reliance on LOB receipts as a means of fulfilling the State's constitutional obligation to fund education. See *Gannon V*, 306 Kan. at 1237 (when considering remedies, "State should remain cautious of challenges arising from an increased reliance upon LOB-generated funding"); *Gannon v. State*, 304 Kan. 490, 501, 372 P.3d 1181 (2016) (*Gannon III*) ("a system of school finance allowing local revenue-raising authority, such as assessing LOB mill levies on property within a school district, will almost certainly create wealth-based disparities among the districts"); *Montoy v. State*, 279 Kan. 817, 834, 112 P.3d 923 (2005) (*Montoy III*) ("increase in the LOB cap exacerbates the wealth-based disparities between districts").

Based on that concern, plaintiffs argue mandating—rather than merely allowing—adoption of a 15% LOB crosses a line into unacceptable inequality because the tax effort needed to raise that amount varies significantly among the districts and supplemental general state aid is not fully equalized. See *Gannon I*, 298 Kan. at 1113, 1183 (after application of a statutory formula, in order to account for differences in property wealth

32

among the districts, the less wealthy ones may also qualify for, and receive from the state, "supplemental general state aid"; "[t]he State provides supplemental general state aid to those districts that have adopted an LOB but have an assessed property valuation per pupil [AVPP] under the 81.2 percentile of statewide AVPP").

The State first responds that this court has held equalization of supplemental general state aid at the 81.2 percentile of AVPP is not constitutionally inequitable. Then, from a practical standpoint, the State points out that the mandatory aspect of the new LOB provision asks nothing more of the districts than they already are doing, since all have previously adopted an LOB at or above the 15% level. So the new requirement has no impact on the degree to which districts rely on LOB funding.

Creeping reliance on districts adopting LOBs at ever-higher levels to meet their operational needs remains a serious concern. As we have said, "the greater the reliance on LOB-generated funds, and the less the reliance on BASE-generated funds, the more the specter of unconstitutional structure looms." *Gannon V*, 306 Kan. at 1205. In this instance, however, the State correctly observes that all districts have already adopted LOBs at the newly mandated level. In fact, almost all have adopted LOBs at a much higher level. This situation makes it more theoretical than likely that a district would want to decrease its LOB below 15%. The sole distinction from the existing structure, therefore, is the mandatory feature on 15% of the districts' already adopted LOBs. That distinction does not, in itself, create Article 6 inequity.

*Required transfer of LOB funds to at-risk and bilingual education funds*

Finally, plaintiffs contend the legislature created inequity by requiring districts to transfer amounts from their LOB funds to their at-risk and bilingual education funds. As mentioned, the amount of a district's LOB that must be transferred is determined by first identifying the amount of the district's total foundation aid that is attributable to at-risk and bilingual weightings and then calculating the ratio of each of those amounts to the district's total foundation aid, which determines the percentage of the LOB to be transferred to the corresponding education funds. S.B. 423, § 4(i)(2)(A) and (B).

Because the adopted LOB percentages vary among districts, plaintiffs argue two districts with equal weighted enrollment and equal numbers of at-risk or bilingual students will transfer different amounts to their at-risk and bilingual education funds. Plaintiffs conclude the result of this requirement is a disparity in the amount of funds transferred per pupil that is based solely on the level of LOB adopted by each district. Since plaintiffs assert protest petition and election provisions prevent some districts from adopting a higher LOB, they contend the required transfers create unconstitutionally wealth-based inequities.

The State characterizes the transfer requirement as no more than a legislative response to the concern expressed in *Gannon V* that LOB funding should not be considered as an equivalent substitute for total foundation aid. *Gannon V*, 306 Kan. at 1203. Computation of total foundation aid incorporates weightings for at-risk and bilingual students, among other factors. In contrast, money received through the LOB makes no adjustment for those weightings, even though the amount a district may raise through its LOB is determined as the product of the adopted LOB percentage and the

34

district's total foundation aid. The State contends the transfer requirement addresses that disconnect by requiring proportional use of LOB funds for the benefit of at-risk and bilingual students.

The adopted LOB percentage obviously varies among districts. *Gannon V*, 306 Kan. at 1204. The factors that affect calculation of total foundation aid, other than at-risk and bilingual weightings, also vary among districts. So when the amount of LOB funding and total foundation aid varies among districts, it is true that the per-pupil amounts transferred to at-risk and bilingual education funds will differ—even for districts with identical percentages of at-risk and bilingual students. Because of that, plaintiffs contend students in those different districts will not have substantially similar educational opportunities. Without explanation or rationale, plaintiffs assert the students in districts where lower per-pupil amounts are transferred will suffer discrimination "based solely on the wealth of the district and its ability to pass an election."

Contrary to plaintiffs' assertion of discrimination, all at-risk and bilingual students arguably benefit from earmarking and transferring existing LOB funds to accounts dedicated to their needs. In the absence of the requirement, the funds may or may not have been allocated to those purposes. The disparities among districts with similar numbers of at-risk and bilingual students preexisted 2018 legislation; they do not arise from the new requirement for allocation of funds to the educational needs of those students. We find no basis to conclude the transfer requirement causes a lack of reasonably equal access to substantially similar educational opportunity through similar tax effort. *Gannon I*, 298 Kan. at 1175 (stating equity test). And we find no merit in plaintiffs' argument.

*Conclusion on equity*

We have observed numerous times over the course of this case that while adequacy and equity are distinct components of Article 6, they do not exist in isolation from each other. See, e.g., *Gannon I*, 298 Kan. at 1199. So crafting a remedy in one area requires care that the balance in the other is not disrupted in the process. Upon our review, we conclude the State has shown that its proposed remedy, under the present circumstances, establishes that the K-12 public education financing system provided by the legislature through S.B. 19, S.B. 423, and S.B. 61 meets Article 6's equity requirement.

## CONCLUSION

The constitutional infirmities regarding equity identified in *Gannon V* have been corrected. And no others have been created by S.B. 423 or S.B. 61, contrary to plaintiffs' present complaints.

The State has not met the adequacy requirement in Article 6 of the Kansas Constitution under its proposed remediation plan. But if the State chooses to make timely financial adjustments in response to the problems identified with the plan and its accompanying calculations and then completes that plan, the State can bring the K-12 public education financing system into constitutional compliance with the adequacy requirement. The two obvious problems appearing in its April 23 memo explaining its compliance plan and calculations are:

1.     The failure to adjust two years of funding for inflation through the approaching 2018-19 school year. Satisfactory adjustments would result in

a higher amount of principal, i.e., more than the $522 million the memo calculates as yet owed to the school districts; and

2.     The failure to adjust for inflation until the memo's calculated principal sum ($522 million, plus the adjustment referenced above) is paid in full, e.g., approximately five years. Satisfactory adjustments would result in more than that principal figure being paid during that span. But we acknowledge the first year of payment—for SY 2018-19—need not be adjusted because that inflation has already been accounted for in paragraph 1 above.

As for the memo's treatment of virtual school state aid, the State needs to explain whether it included that aid in the first step of its analysis when it generated the initial total aid amount of $3,108,690,821. Because if not, we are unable to conceive of a rationale for the State later deducting it to calculate the total target additional aid of $522,244,721.

In being "mindful of the connection between equity and adequacy" when considering its cures, *Gannon IV*, 305 Kan. at 917, the State should continue to appreciate the dangers arising from an increased reliance upon LOB-generated funding (and less upon base-aid-generated funding) as it seeks to make suitable provision for finance of the educational interests of the state. See *Gannon III*, 304 Kan. at 501; see also *Gannon V*, 306 Kan. at 1203-06 ("the greater the reliance on LOB-generated funds, and the less the reliance on BASE-generated funds, the more the specter of unconstitutional structure looms").

Because of the problems with adequacy we retain jurisdiction and stay the issuance of today's mandate until June 30, 2019, or until further order of the court.

In short, the KSEEA—enacted by S.B. 19—will remain in temporary effect. And S.B. 423 and S.B. 61 can go into temporary effect on the dates that legislation has scheduled until further order of this court. This action acknowledges the State's position—that the 2018 legislature's efforts and the amount of money added for the approaching school year should permit such an extension through the 2019 regular legislative session—and effectively grants its repeated request to so extend.

The situation facing the State after *Gannon V* was released on October 2, 2017, was substantially more complex than the one facing it with the release of today's decision. See 306 Kan. at 1238 (both equity and adequacy involved; attendant issues numerous and complex requiring detailed, comprehensive analysis). Because of the legislature's work during the 2018 session, the issues now are narrower, e.g., funding the system the legislature created. See, e.g., *Gannon II*, 303 Kan. at 745 (reaching constitutional compliance within four months of decision "is definitely achievable by the legislature, as it demonstrated in 2014"). We have confidence the legislature can again meet its constitutional duty. See *Gannon I*, 298 Kan. at 1146-47 (language of Article 6 both empowers and obligates the legislature to make suitable provision for finance of the educational interests of the state).

Toward that end, and consistent with our continuing jurisdiction, no later than April 15, 2019, the parties' concurrent briefs addressing any legislative remedies of constitutional infirmities will be due in this court. Response briefs will be due April 25,

38

and oral arguments will be conducted on May 9 at 9 a.m. The court's decision will be communicated by June 30.

Exceptions to this schedule will be made to accelerate the deadlines as needed in order to consider earlier remedial legislation—created by special session or otherwise. Acceleration is greatly encouraged because 286 school districts must plan for the upcoming school year—districts that serve more than 489,000 students and employ more than 37,000 teachers, over 3,600 other licensed personnel, and over 26,000 unclassified employees.

As we said on June 3, 2005, in *Montoy III*:

"Time is running out for the school districts to prepare their budgets, staff their classrooms and offices, and begin the . . . school year. School districts need to know what funding will be available as soon as possible." 279 Kan. at 844.

BEIER and STEGALL, JJ., not participating.

MICHAEL J. MALONE and DAVID L. STUTZMAN, Senior Judges, assigned.[1]

---

[1] **REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,267 vice Justice Stegall under the authority vested in the Supreme Court by K.S.A. 20-2616, and Senior Judge Stutzman was appointed to hear the same case vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.