IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,267

LUKE GANNON, BY HIS NEXT FRIENDS AND GUARDIANS, *et al.*,
*Appellees*,

v.

STATE OF KANSAS,
*Appellant.*

SYLLABUS BY THE COURT

1.

A party asserting compliance with a court decision ordering remedial action bears the burden of establishing such compliance.

2.

To determine compliance with the adequacy requirement in Article 6 of the Kansas Constitution, Kansas courts apply the test from *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989), which establishes minimum standards for providing adequate education. More specifically, the adequacy requirement is met when the public education financing system for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 72-3218.

1

3.

The State has shown its proposed remedy substantially complies with our mandate from *Gannon v. State*, 308 Kan. 372, 420 P.3d 477 (2018).

4.

Appellate jurisdiction carries with it the power to review a law and determine its constitutionality. By implication, this also includes the inherent power to protect that jurisdiction and enforce the holdings of the court.

Appeal from Shawnee District Court; FRANKLIN R. THEIS, ROBERT J. FLEMING, and JACK L. BURR, judges. Opinion filed June 14, 2019. The State has shown its proposed remedy substantially complies with our mandate from *Gannon v. State*, 308 Kan. 372, 420 P.3d 477 (2018). We retain jurisdiction.

*Toby J. Crouse*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *Arthur S. Chalmers*, assistant attorney general, *M.J. Willoughby*, assistant attorney general, *Dwight R. Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant State of Kansas.

*Alan L. Rupe*, of Lewis Brisbois Bisgaard & Smith LLP, of Wichita, argued the cause, and *Jessica L. Skladzien*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the briefs for appellees.

PER CURIAM: Last June we held the State had resolved nearly all of the issues in this long-running school finance appeal. *Gannon v. State*, 308 Kan. 372, 420 P.3d 477 (2018) (*Gannon VI*). We specifically concluded that through legislation enacted in 2017

and 2018, the State had met its burden of complying with the equity requirements of Article 6, § 6(b) of the Kansas Constitution (obligating the Legislature to "make suitable provision for finance of the educational interests of the state"). 308 Kan. at 373-74.

We further held that the State had not met § 6(b)'s adequacy requirement, although we acknowledged the State had "expressed an intent to comply with the adequacy threshold discussed in *Montoy v. State*, 282 Kan. 9, 138 P.3d 755 (2006) (*Montoy IV*)" through its self-styled "*Montoy* safe harbor" plan. 308 Kan. at 374. Specifically, we held the State needed to make timely financial adjustments in response to two inflation problems we identified to "satisfactorily address the remaining constitutional infirmities in adequacy appearing in its chosen plan and particularly in the implementation." 308 Kan. at 374.

Because of the problems with adequacy we retained jurisdiction and stayed the issuance of our mandate more than one year—until June 30, 2019—or further order of the court. We reasoned this gave the State ample opportunity to make those financial adjustments and reach constitutional compliance. The State now claims to have done so through legislative passage of 2019 House Substitute for Senate Bill 16 (S.B. 16), which the Governor signed into law on April 6, 2019.

We now hold that through S.B. 16's additional funding of its *Montoy* safe harbor plan, the State has substantially complied with our mandate from *Gannon VI*. And we retain jurisdiction to ensure continued compliance with that mandate.

3

*2006-2013: Post-*Montoy IV

This case has a long history—one that dates back at least as far as the conclusion of the last major school finance case, *Montoy IV*. The *Montoy* litigation ended on July 28, 2006, when we held the State had enacted legislation in substantial compliance with our orders. *Montoy IV*, 282 Kan. at 24-25. And we dismissed the case.

Before the State fully implemented the financial solution we accepted in *Montoy IV*, however, it started making significant cuts to education funding in school year (SY) 2008-09 (fiscal year 2009). The plaintiffs filed this lawsuit in 2010 in response to those cuts. After a 16-day bench trial, a three-judge district court panel concluded the State had failed to provide suitable funding for K-12 public education in violation of Article 6 of the Kansas Constitution. The State appealed.

*2014:* Gannon I

On March 7, 2014, we remanded for the three-judge panel to apply a refined test for education adequacy partially based on *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989), whose standards the Legislature essentially had codified in 2005. *Gannon v. State*, 298 Kan. 1107, 319 P.3d 1196 (2014) (*Gannon I*).

4

*2015:  Panel decision and CLASS*

On remand, the panel applied our refined test for adequacy and held the Legislature underfunded education between fiscal years (FY) 2009 and 2012.

This decision led the 2015 Legislature to repeal its longstanding—and chief—vehicle for public school financing:  the School District Finance and Quality Performance Act (SDFQPA). The Legislature replaced the SDFQPA with the Classroom Learning Assuring Student Success Act (CLASS). CLASS established block grants in place of the SDFQPA formula and froze funding levels for FY 2016 and FY 2017 at the FY 2015 level until CLASS was to expire on June 30, 2017.

Upon review, the panel held CLASS also was unconstitutional. And the State again appealed to this court.

*2016:  Gannon II and III*

The next five months brought a series of legislative actions and this court's decisions solely on the issue of § 6(b)'s equity requirement. On February 11, 2016, we agreed with the panel that CLASS created constitutional equity violations. *Gannon v. State*, 303 Kan. 682, 368 P.3d 1024 (2016) (*Gannon II*). After later legislative action, we held on May 27, 2016, the inequities had not been cured. *Gannon v. State*, 304 Kan. 490, 372 P.3d 1181 (2016) (*Gannon III*).

Less than one month later, the Legislature revived the structure of the SDFQPA. The parties filed a joint stipulation agreeing the State was now in compliance with the constitutional equity requirement. By order filed June 28, 2016, we held the Legislature had satisfied our orders in *Gannon I*, *Gannon II*, and *Gannon III* regarding equity for SY 2016-17. We retained jurisdiction of the case and all issues and provided the parties time to brief and argue the adequacy portion of the litigation yet to be decided.

*2017:* Gannon IV*, Gannon V*, *and S.B.19*

On March 2, 2017, we addressed the adequacy issues in *Gannon v. State*, 305 Kan. 850, 390 P.3d 461 (2017) (*Gannon IV*). There, we held the school finance system was constitutionally inadequate in both structure and implementation. In particular, the State had failed to show that the finance system was reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose*, 790 S.W.2d 186. We gave the State until June 30, 2017, to provide adequate funding. *Gannon IV*, 305 Kan. at 919.

The 2017 Legislature responded to the adequacy structural violation by passing 2017 Senate Bill 19 (S.B. 19), which enacted the Kansas School Equity and Enhancement Act (KSEEA). It essentially provides a base aid formula for distributing education funds in the same way the SDFQPA had done. S.B. 19 also added $317 million over two years—FY 2018 and FY 2019.

On October 2, 2017, we examined S.B. 19 in *Gannon v. State*, 306 Kan. 1170, 402 P.3d 513 (2017) (*Gannon V*), and rejected plaintiffs' claims that failure to fund three

6

statutory requirements rendered S.B. 19's structure unconstitutional. Of significance to the issues now before us, although millions of dollars had been added, we also held the State had failed to meet its burden to satisfactorily demonstrate S.B. 19 was reasonably calculated to address the inadequate implementation of funding. And S.B. 19 created four equity violations. 306 Kan. at 1212-13. We stayed issuance of the mandate—allowing S.B. 19 to take effect—until June 30, 2018, giving the State sufficient time to provide adequate funding and cure the inequities. 306 Kan. at 1239. The KSEEA temporarily became law and is now codified at K.S.A. 72-5131 et seq.

*2018: S.B. 423, S.B. 61, and* Gannon VI

In response to the funding shortfall identified in *Gannon V*, the 2018 Legislature passed 2018 Substitute for Senate Bill 423 (S.B. 423) and 2018 House Substitute for Senate Bill 61 (S.B. 61). These bills amended the provisions of S.B. 19 enacted in 2017. Among other things, they scheduled adding $522 million over a five-year period—SY 2018-19 to SY 2022-23. Together with S.B. 19's funds, the Legislature was projected to add approximately $854 million over a six-year period.

Based on the recent passage of S.B. 423 and S.B. 61, the State filed a notice of cure, which we reviewed on June 25, 2018, in *Gannon VI*. There, we held that under the present circumstances the State had corrected the *Gannon V* constitutional infirmities regarding equity and created no others. 308 Kan. at 374.

7

As for adequacy, we observed the State had rejected the report and financial opinions of its expert witness and instead presented a financial remediation plan it called the *Montoy* safe harbor. 308 Kan. at 384-87. The State essentially contended:

1.      because the three-judge panel ruled the State's K-12 education funding reached constitutional adequacy within several years after *Montoy IV* and before cuts began; and

2.      because the panel's determination of adequacy was based upon the formula's funding increases after the decisions in *Montoy v. State*, 278 Kan. 769, 120 P.3d 306 (2005) (*Montoy II*), *Montoy v. State*, 279 Kan. 817, 112 P.3d 923 (2005) (*Montoy III*), and *Montoy IV*;

3.      then the State's return to the basic formula of that time—and its resultant funding (plus accounting for inflation)—should again produce a constitutionally adequate level of funding. See *Gannon VI*, 308 Kan. at 387.

Through a series of calculations we analyzed in detail in *Gannon VI*, the State asserted that by adding $522.2 million to the K-12 school budget via S.B. 423 and S.B. 61 over five years, it would reach the *Montoy* safe harbor. 308 Kan. at 384-93. The increases included additional funding for base aid, special education, pre-kindergarten at-risk programs, ACT and WorkKey assessments, teacher mentoring, mental health and JAG-K pilot programs, transportation weighting, supplemental general state aid effects, authority for the local option budget, and KPERS. See 308 Kan. at 378, 380-82, 389 (discussing all of these types of additional funding). Thus, the State contended it had

8

provided funding comparable in value to that existing before the cuts began less than three years after *Montoy IV*.

We acknowledged the State had increased funding to try to remedy the substantial cuts. We held that while funding added by S.B. 61 and S.B. 423 came closer to resolving the adequacy issue, it did not succeed. Specifically, while the State considered the post-*Montoy* effects of inflation for SY 2010-11 to SY 2016-17 in its calculations to reach $522 million, it failed to do so for SY 2017-18 and SY 2018-19 in its multi-year plan. The State also failed to consider inflationary effects during the five-year payout:

> "The State has not met the adequacy requirement in Article 6 of the Kansas Constitution under its proposed remediation plan. But if the State chooses to make timely financial adjustments in response to the problems identified with the plan and its accompanying calculations and then completes that plan, the State can bring the K-12 public education financing system into constitutional compliance with the adequacy requirement. The two obvious problems appearing in its April 23 memo explaining its compliance plan and calculations are:

> > "1. The failure to adjust two years of funding for inflation through the approaching 2018-19 school year. Satisfactory adjustments would result in a higher amount of principal, i.e., more than the $522 million the memo calculates as yet owed to the school districts; and

> > "2. The failure to adjust for inflation until the memo's calculated principal sum ($522 million, plus the adjustment referenced above) is paid in full, e.g., approximately five years. Satisfactory adjustments would result in more than that principal figure being paid during that span. But we acknowledge the first year of payment—for SY 2018-19—need not be

9

adjusted because that inflation has already been accounted for in paragraph 1 above." *Gannon VI*, 308 Kan. at 398-99.

In addition to advising the State it could reach compliance by making timely financial adjustments in response to the two problems and then completing the plan, we also pointed out that the State needed to explain its treatment of virtual state aid in its calculations. *Gannon VI*, 308 Kan. at 399.

Because of the problems with adequacy, we retained jurisdiction and again stayed the issuance of our mandate—until June 30, 2019—to once again give the State ample time to achieve constitutionality. The KSEEA—enacted in 2017 by S.B. 19—remained in temporary effect. And the S.B. 423 and S.B. 61 amendments went into temporary effect as well. 308 Kan. at 399-400.

*2019:  S.B. 16*

Following our June 25, 2018 decision in *Gannon VI*, the 2019 Legislature passed S.B. 16 in an effort to cover inflation with additional funding and thus complete its safe harbor remediation plan. On April 6, 2019, Governor Kelly signed S.B. 16 into law.

The State now submits its updated remediation plan for our review.

10

Issue: *The State's timely financial adjustments make its* Montoy *safe harbor plan substantially compliant with* Gannon VI*'s mandate to account for inflation.*

Given our decision in *Gannon VI*, we now have far fewer issues to resolve. They are whether (1) the State has met its burden to explain its treatment of virtual state aid in its funding calculations; and (2) S.B. 16 provides enough additional funding to account for the previously identified inflation problems and to reach substantial compliance with our *Gannon VI* mandate. The State asserts it has explained the virtual state aid issue and has reached its self-styled *Montoy* safe harbor—or has at least substantially complied with our mandate in *Gannon VI*. The plaintiffs ardently disagree.

*Standard of Review and Burden of Proof*

We set out our standard of review for constitutional adequacy in *Gannon VI*, and it is the same here:

> """Whether through structure and implementation the K-12 system is reasonably calculated to have all public education students meet or exceed the *Rose* [*v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989)] standards presents a mixed question of fact and law. When an appellate court reviews these mixed questions, it applies a bifurcated standard of review. Insofar as any of the panel's factual findings are in dispute, the court applies a substantial competent evidence standard. 'Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.' *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014) (*Gannon I*).

11

"'"In determining whether substantial competent evidence supports the district court's findings, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it. *Gannon I*, 298 Kan. at 1175-76 (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1195-96, 221 P.3d 1130 [2009]). Accordingly, appellate courts do not reweigh the evidence or assess the credibility of witnesses. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

"'"The panel's conclusions of law based on those findings are subject to our unlimited review. 298 Kan. at 1176, 1182. The ultimate determination of whether the legislature is in compliance with Article 6, § 6(b) of the Kansas Constitution is a question of law. See *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009) (constitutionality of statutes presents question of law over which Supreme Court exercises unlimited review)." *Gannon IV*, 305 Kan. at 880-81.'" *Gannon VI*, 308 Kan. at 382-83.

The burden of proof remains with the State. As we have stated several times in the *Gannon* appeals:

"'As for the burden of proof, it remains with the State, as we stated in *Gannon IV* regarding the State's future efforts to replace CLASS that was due to expire on June 30, 2017:

"'"Once a new financing system is enacted, the State will have to satisfactorily demonstrate to this court by June 30, 2017, that its proposed remedy is reasonably calculated to address the constitutional violations identified, as well as comports with previously identified constitutional mandates such as equity. [Citation omitted.]

"'"For those purposes, the State will bear the burden of establishing such compliance and explaining its rationales for the choices made to achieve it. See *Gannon*

12

*II*, 303 Kan. at 709 (party asserting compliance with court decision ordering remedial action bears burden of establishing that compliance)." *Gannon IV*, 305 Kan. at 856.

> . . . .

> "'As further explained below, in addition to our again taking judicial notice of appropriate facts, we previously held that the panel's findings of fact were supported by substantial competent evidence. *Gannon IV*, 305 Kan. at 881.'" *Gannon VI*, 308 Kan. at 383.

Montoy *Safe Harbor*

In *Gannon VI*, we described in some detail the *Montoy* safe harbor proposed by the State. To highly summarize, the State reasoned that if it returned to the basic funding formula approved in *Montoy IV* for SY 2009-10 and provided the funding under that formula—including accounting for inflation—it would again reach a constitutionally adequate funding level. 308 Kan. at 386-87.

In making this argument, the State relied heavily on an April 23, 2018 two-page memo from the Kansas Legislative Research Department (KLRD) to Legislative Counsel Curtis Tideman (April 23, 2018 memo) as the basis for the calculations underlying the State's *Montoy* safe harbor remediation plan.

In the April 23, 2018 memo, the State used the formula, base aid amount, and weightings in place in SY 2009-10 (FY 2010) to calculate the total aid amount to the schools for that year: $3,108,690,821. It then adjusted that amount for inflation with yearly increases through SY 2016-17 for a total of $3,434,941,542.

13

Then the State made several reductions. It subtracted state aid "already scheduled." This included virtual school state aid, state foundation (base) aid for SY 2017-18, and the scheduled increase for SY 2018-19 under S.B. 19. Through this computation, the State generated a "total target additional aid" of $522,244,721 in additional funding needed to approximate the same amount, i.e., the same value of funds in SY 2018-19 as the funding formula had provided for SY 2009-10.

*Virtual School State Aid*

In *Gannon VI*, we asked the State to clarify how virtual state aid fit into the calculations from the April 23, 2018 memo:

> "As for the memo's treatment of virtual school state aid, the State needs to explain whether it included that aid in the first step of its analysis when it generated the initial total aid amount of $3,108,690,821 [for FY 2010]. Because if not, we are unable to conceive of a rationale for the State later deducting it to calculate the total target additional aid of $522,244,721." *Gannon VI*, 308 Kan. at 399.

In response, the State cites to a March 27, 2019 memo from the KLRD. That memo explains that virtual state aid operated within the funding formula before 2015 and so would have been included as a weighting within the formula during SY 2009-10. After enactment in 2008, the Virtual School Act was codified at K.S.A. 2008 Supp. 72-3711 through 72-3716 by 2008 Senate Bill 669 (S.B. 669). The Act was repealed in 2015 when the Legislature replaced SDFQPA with the block grant system in CLASS in 2015 Senate Bill 7 (S.B. 7). S.B. 7 eliminated the virtual school weighting and replaced it with virtual

14

school state aid as categorical aid outside of the formula. The State explains that because the initial total aid amount of $3,108,690,821 was based on the formula as it existed in SY 2009-10, virtual school state aid was included as a weighting within the formula at that time. According to the State, it therefore was included in the first step of the analysis generating the "target aid amount" for the remediation plan of $522.2 million shown in the memo. Without any specific analysis, the plaintiffs contend the State has failed to justify reducing the total amount necessary to fund inflation by the amount of virtual state aid.

We accept the State's explanation. We hold it has met its burden to show that virtual state aid was included in the formula in SY 2009-10 (and thus for the purposes of the April 23, 2018 memo) even though it is no longer contained in the formula. Compare K.S.A. 2010 Supp. 72-3715(d)(2)(A) ("Multiply the full-time equivalent enrollment of the virtual school by an amount equal to 105% of the amount of the base state aid per pupil.") with K.S.A. 72-3715(d) (generally providing $5,000 per FTE in the virtual school).

### *Inflation and Our Mandate from* Gannon VI

After careful analysis, we accepted the State's *Montoy* safe harbor approach in *Gannon VI* and found its accompanying funding could be constitutionally adequate if the State made sufficient adjustments for inflation. To the extent plaintiffs are asking us to reexamine the viability of this safe harbor model itself, we will not do so. Instead, we will focus on the specific inflationary problems we identified.

In reviewing the parties' present arguments on inflation, we return to the language of our mandate in *Gannon VI*. There, we identified the two obvious problems appearing in the State's April 23, 2018 memo explaining the State's compliance plan and calculations. 308 Kan. at 390. But we did not prescribe a particular method for how to make satisfactory adjustments for inflation. Nor did we identify a specific amount of corrective funding needed. Rather, we left it to the State to determine how to account for inflation in compliance with our mandate, subject to our further review. As we said in *Gannon I*:

> "[O]ur Kansas Constitution clearly leaves to the legislature the myriad of choices available to perform its constitutional duty; but when the question becomes whether the legislature has actually performed its duty, that most basic question is left to the courts to answer under our system of checks and balances." 298 Kan. at 1151.

That said, we also acknowledge compliance sometimes can be achieved without strict adherence to a particular plan. See *Gannon I*, 298 Kan. at 1170 ("For example, even if a legislature had not considered actual costs, a constitutionally adequate education nevertheless could have been provided—*albeit perhaps accidentally* or for worthy non-cost-based reasons." [Emphasis added.]).

As mentioned, the first problem with the State's plan as enacted in 2018 arose because its April 23, 2018 memo only calculated inflation through FY 2017. The State failed "to adjust two years of funding for inflation through the approaching 2018-19 school year [FY 2019]." We stated that "[s]atisfactory adjustments would result in a higher amount of principal, i.e., more than the $522 million the memo calculates as yet owed to the school districts." *Gannon VI*, 308 Kan. at 399.

16

As presented by both parties, if the State had continued the calculations from the April 23, 2018 memo, the missing inflation amount on the total aid for SY 2017-18 would be $49,463,158 and for SY 2018-19 would be $50,175,428 for a combined total of $99,638,586. By adding this total to the $522.2 million already outlined and accepted in *Gannon VI*, the total principal amount of the State's *Montoy* safe harbor compliance plan becomes approximately $621.9 million.

As to the State's second problem, the State opted to spread its remediation plan payments over five years—but failed to adjust for inflation over that timeframe. Specifically, we held the State failed "to adjust for inflation until the memo's calculated principal sum ($522 million, plus the adjustment referenced above) is paid in full, e.g., approximately five years." We determined "[s]atisfactory adjustments would result in more than that principal figure being paid during that span." *Gannon VI*, 308 Kan. at 399.

The amount of funding actually provided by the State to make adjustments addressing both problems is found in S.B. 16 as discussed below.

*Additional Funding Provided by S.B. 16*

To place in context the funding added by S.B. 16 in 2019, we first review the base aid amount increased by the Legislature in its 2017 and 2018 sessions. In 2017, the Legislature enacted S.B. 19, which set the base aid per pupil for SY 2017-18 at $4,006 and for SY 2018-19 at $4,128. The Legislature determined that after SY 2018-19, the base aid simply would increase by an average of the consumer price index (CPI) for the Midwest region for the preceding three school years. S.B. 19 (2017).

17

In 2018—through S.B. 61—the Legislature again increased base aid amounts to try to help bring school funding up to adequate levels under its *Montoy* safe harbor plan. In a departure from S.B. 19's method, the Legislature increased the base aid by specific amounts every year for a five-year remedial period, i.e., ending in SY 2022-23. Later years would have annual base aid general increases based on a particular CPI. S.B. 61 provides:

> "'Base aid for student excellence' or 'BASE aid' means an amount appropriated by the legislature in a fiscal year for the designated year. The amount of BASE aid shall be as follows:
>
> (1)     For school year 2018-2019, $4,165 [*increase of $37 from 2017 S.B. 19's $4,128*];
>
> (2)     for school year 2019-2020, $4,302;
>
> (3)     for school year 2020-2021, $4,439;
>
> (4)     for school year 2021-2022, $4,576;
>
> (5)     for school year 2022-2023, $4,713; and
>
> (6)     for school year 2023-2024, and each school year thereafter, the BASE aid shall be the BASE aid amount for the immediately preceding school year plus an amount equal to the average percentage increase in the consumer price index for all urban consumers in the midwest region as published by the bureau of labor statistics of the United States department of labor during the three immediately preceding school years rounded to the nearest whole dollar amount." (Emphasis added.) K.S.A. 72-5132(e).

18

In 2019—through S.B. 16—the Legislature tried to account for the inflation problems we identified in *Gannon VI*. It made the adjustment by increasing the specific base aid figure for each of the remaining four years of the remediation plan—SY 2019-20 through SY 2022-23. Later years' annual inflation adjustments were general, again following a particular CPI. S.B. 16 provides:

> "'Base aid for student excellence' or 'BASE aid' means an amount appropriated by the legislature in a fiscal year for the designated year. The amount of BASE aid shall be as follows:
>
> (1)     For school year 2018-2019, $4,165;
>
> (2)     *for school year 2019-2020, ~~$4,302~~ $4,436* [*increase of $134 from 2018's S.B. 61 amount*]*;*
>
> (3)     for school year 2020-2021, ~~$4,439~~ *$4,569* [increase of $130 from S.B. 61];
>
> (4)     for school year 2021-2022, ~~$4,576~~ *$4,706* [increase of $130 from S.B. 61];
>
> (5)     for school year 2022-2023, ~~$4,713~~ *$4,846* [increase of $133 from S.B. 61]; and
>
> (6)     for school year 2023-2024, and each school year thereafter, the BASE aid shall be the BASE aid amount for the immediately preceding school year plus an amount equal to the average percentage increase in the consumer price index for all urban consumers in the midwest region as published by the bureau of labor statistics of the United States department of labor during the three immediately

preceding school years rounded to the nearest whole dollar amount." (Emphasis added.)

When the increased annual base aid figure is multiplied by the estimated total adjusted enrollment for that year, millions of additional dollars are produced. See *Gannon I*, 298 Kan. at 1112 (describing application of SDFQPA's similar formula). For SY 2019-20, the State calculates the planned increase of $134 in base aid would produce approximately an additional $90 million. ($134 x 691,025 adjusted enrollment). Given similar annual base aid increases in each of the remaining three years of the State's plan—$130 for SY 2020-21, $130 for SY 2021-22, and $133 for SY 2022-23—they would each produce approximately $90 million more than the increases S.B. 61 provided for the same years.

The State argues these annual increases address the inflation concerns expressed in *Gannon VI* and bring funding well within its self-styled *Montoy* safe harbor. This basic approach was crafted by the state's deputy commissioner of education. The approach, or slight variations of it, was relied upon by the Kansas State Department of Education, the Kansas State Board of Education, the Legislature, and the Governor.

The plaintiffs agree that the $363 million is the amount necessary to provide for inflation and that S.B. 16 is scheduled to provide it. But they argue S.B. 16 fails to actually provide $363 million in "new money" needed to reach the *Montoy* safe harbor. See *Gannon VI*, 308 Kan. at 378 (The State defines new money as only "the first time a new dollar enters the funding system."). Plaintiffs particularly contend the State simply adds the "same" $90 million each year for four years to total $363 million. So they agree the State has adequately funded education with $90 million in new money for the

upcoming 2019-20 school year—the first year of the remediation plan—but they disagree it has increased education funding with new money for the remaining three years.

Rather than reviewing the arguments about whether the Legislature carefully followed the deputy commissioner's plan or successfully reached the same figure that he ultimately calculated, we instead consider the fidelity of S.B. 16 to our charge in *Gannon VI,* 308 Kan. at 374 (State must consider effects of inflation for SY 2017-18 and SY 2018-19 in its calculations to reach new principal beyond $522 million and consider inflationary effects during the five-year period over which it wants to pay out re-calculated new principal). So under the present charge, labeling remedial money as new, old, or otherwise is of no import. Instead, the question remains:  whether with these funding adjustments to the safe harbor plan, the State has substantially complied with our *Gannon VI* mandate. More specifically, has it protected the total money (both old and new) that we identified in *Gannon VI* from being devalued by inflation? We address that question below.

*Compliance*

The State has the burden to satisfactorily demonstrate that its proposed remedy is reasonably calculated to address the constitutional violations identified and comports with previously identified constitutional mandates. And the State has the burden of establishing such compliance and explaining its rationales for the choices made to achieve it. See *Gannon VI*, 308 Kan. at 383. As to whether the State has met its burden, we look now for guidance in *Montoy IV*. See 282 Kan. at 19 (The "sole issue now before

21

this court is whether the legislation . . . compl[ies] with the previous orders of this court.").

In *Montoy IV*, we observed the funding of public education is extraordinarily complex and at that point the Legislature's efforts in 2005 and 2006 had resulted in at least an additional $755.6 million in education funding. We concluded the State had complied with our orders. We affirmed the judgment of the district court and reversed in part, lifted the stays imposed at the time, dismissed the appeal, and remanded to the district court with directions to dismiss the pending case. 282 Kan. 24-27. As we previously described *Montoy IV*:

> "[W]e held that the projected funds would *'substantially' comply* with the level established in those studies, *i.e., an amount reasonably close* to the funds necessary for schools to meet the legislature's own standards for an adequate education." *Montoy v. State*, 282 Kan. 9, 21-22, 138 P.3d 755 (2006) (*Montoy IV*)." (Emphasis added.) *Gannon I*, 298 Kan. at 1162-63.

Here, in assessing substantial compliance with our orders, we consider the inexact nature of accounting for years of future inflation on millions of dollars. While the Kansas State Department of Education, the Legislature, and the Governor have provided us with their best figures, the numbers remain good faith *estimates*. Other variables add to the imprecision inherent to this question, e.g., projections for the size of the actual student population in Kansas for each year and the number of those students subject to weighting factors. See *Gannon I*, 298 Kan. at 1112 (aid includes adjusting a district's full-time equivalent enrollment by adding various weightings based on the recognition that the needs of some students require more resources than others); see also K.S.A. 72-5132(a)

22

(identifying the weightings); *Gannon V*, 306 Kan. at 1203 (describing effect of solely applying at-risk weighting factor). These calculations are in sharp contrast to those where actual inflation was already known: the ones the State performed in *Gannon VI* for past years SY 2010-11 to SY 2016-17 and those we ordered performed for SY 2017-18 and the recently completed SY 2018-19.

With that imprecision in mind, we hold the version of KSEEA in place with the adoption of S.B. 16 substantially complies with our orders expressed in *Gannon VI*, 308 Kan. at 374. S.B. 16 schedules annual increases to base aid figures over those increases contained in 2018's S.B. 61. Its planned addition of approximately $90 million per year for four years would cover the $100 million increase in principal—due to past and present inflation—from approximately $522 million to about $622 million. And by employing estimates and projections now available, it also protects against the devaluing effects of future inflation on the $622 million. At the end of those four years, that protection for the base aid is provided through indexing to a CPI standard. The legislative record establishes the sole reason for these increases was to provide for inflation as required by our order in *Gannon VI*. While the plaintiffs submit an alternative calculation, the adequacy test "rejects any litmus test that relies on specific funding levels to reach constitutional compliance." *Gannon IV*, 305 Kan. at 917. And we did not order specific levels or even prescribe a particular method for how to calculate any levels.

*We Retain Jurisdiction*

In *Gannon VI*, we stayed issuance of the mandate until June 30, 2019, or until further order of the court. The KSEEA, S.B. 423, and S.B. 61 then were allowed to go into temporary effect. 308 Kan. at 374-75.

Maintaining its position that it certainly has at least achieved substantial compliance with our order, the State urges us to dismiss this case. The State can point to its compliance with some of our prior decisions in school finance. See, e.g., *Gannon VI*, 308 Kan. at 398 (compliance regarding equity issues); *Gannon V*, 306 Kan. at 1238 (compliance regarding equity issue); *Gannon III*, 304 Kan. at 503 (compliance regarding capital outlay); *Gannon v. State*, No. 113,267 (order dated June 28, 2016) (legislative response cured the constitutional inequities identified in *Gannon II* and *Gannon III* for SY 2016-17); *Montoy IV*, 282 Kan. at 26-27 (substantial compliance with court order); *U.S.D. No. 229*, 256 Kan. at 275 (concluding SDFQPA is constitutionally permissible legislation).

In response, the plaintiffs ask that we retain jurisdiction until all planned funding has been phased in successfully. As support, they specifically cite a legislative attempt to reclaim educational funds this session and the State's reversal of course after *Montoy IV* was concluded but before the (full) funding approved there was phased in. They also can point to the State's long-term failure to adequately fund education. See *Gannon V*, 306 Kan. at 1236 ("Including today's decision, by our count inadequacy has been judicially declared to exist from school years 2002-2003 through 2018-2019, with the possible exception of three years of 'substantial compliance' for 'interim purposes.'").

24

While we do conclude S.B. 16's financial adjustments to the safe harbor plan bring the State into substantial compliance with our *Gannon VI* mandate, we retain jurisdiction to ensure continued implementation of the scheduled funding. As we previously stated:

> "[T]he judiciary clearly has the power to review a law and potentially declare it unconstitutional. But this power is not limited solely to review. It also includes the inherent power to enforce our holdings. [Citations omitted.] Without the inherent power to impose remedies and otherwise enforce our holdings, our power to review would be virtually meaningless. See *Kjellander v. Kjellander*, 90 Kan. 112, 114, 132 P. 1170 (1913) ('The appellate jurisdiction conferred carries with it, by implication, the power to protect that jurisdiction and to make the decisions of the court thereunder effective.')."
> *Gannon II*, 303 Kan. at 737-38.

See also *C. K. & W. Rld. Co. v. Comm'rs of Chase Co.*, 42 Kan. 223, 225, 21 P. 1071 (1889) ("Inherently the supreme court must have the power to protect its own jurisdiction, its own process, its own proceedings, its own orders, and its own judgments.").

BEIER and STEGALL, JJ., not participating.

MICHAEL J. MALONE and DAVID L. STUTZMAN, Senior Judges, assigned.[1]

_____

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,267 vice Justice Stegall under the authority vested in the Supreme Court by K.S.A. 20-2616, and Senior Judge Stutzman was appointed to hear the same case vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.